Dale B. SNEARLY, Appellant (Defendant below),

v.

De Loss HOCKETT and H. F. Hockett, Appellees (Plaintiffs below).

Amy WOLF, Appellant (Defendant below),

v.

De Loss HOCKETT and H. F. Hockett, Appellees (Plaintiffs below).

Nos. 2924, 2925.

Supreme Court of Wyoming.

May 31, 1960.

John P. Ilsley, Gillette, for appellant.

Ernest Wilkerson, Casper, and Thomas Morgan, Gillette, for appellees.

Before BLUME, C. J., and PARKER and HARNSBERGER, JJ.

Mr. Chief Justice BLUME delivered the opinion of the court.

Two actions were consolidated for trial in the District Court of Campbell County, Wyoming, one against Dale B. Snearly and one against Amy Wolf. The appeals were also consolidated for hearing in this court. Plaintiffs in their petition against Snearly claimed that the latter wilfully and wrongfully misappropriated the funds of the plaintiffs and was overpaid in the sum of $21,565 and asked judgment for that amount against him. In the petition against Amy Wolf plaintiffs claimed that the latter was overpaid the amount of $3,182.50 and asked judgment against her for that amount. The court awarded judgment against Snearly for the amount of $13,565 and judgment against Amy Wolf for $1,982.50. The defendants have both appealed. The parties will be referred to herein as in the court below or by name or by other proper identification.

Plaintiffs Hockett were operating as the Gillette Livestock Exchange, acquiring livestock, collecting it at or near Gillette and selling it at auction. Their business is referred to in the record as one engaged in a sales ring. Their business amounted to some three and a half to four million dollars a year. When making sales they employed an auctioneer and also a man who "clerked the sales". Defendant Snearly was employed to clerk the sales on behalf of the plaintiffs and was given authority to sign checks payable out of the bank account of the plaintiffs at Gillette. The business of clerking sales is described by defendant Snearly as follows (Q. 1168): "My duties at the Livestock Exchange were to supervise the office procedure and to write the checks in payment to the consignors for their livestock and, after the sale was finished, to reconcile the consignors and purchasers of accounts as far as correctness of the sale was concerned." The agreement between the parties, concerning which there is no dispute, was that Snearly was to receive the sum of $25 for each sale except that after September 1, 1956, he was to be paid $30 per sale. Plaintiffs testified that that was the only agreement between the parties and that Snearly was entitled only to the compensation for these sales, namely $4,750 for 190 sales at $25 per sale and $930 for 31 sales at the rate of $30 per sale, a total of $5,680. The original complaint of the plaintiffs was based on that theory, although the complaint was somewhat amended later, the particulars of which need not be mentioned herein.

The defendant Snearly paid himself the total sum of $27,245. He claimed he was entitled to this amount by reason of extra duties over and above that for clerking sales. This extra duty he described as follows (Q. 1170): "Those duties were to do their bookkeeping service for the general account, to write checks in payment of their bills and their salaries of their employees and to take care of some of their correspondence and do other duties as they would ask me to do, and also to be of

assistance to them in any way that I could." The trial court allowed the sum of $5,680 for clerking the sales and also allowed compensation for extra duties, namely $6,000 computed at the rate of $125 per month for 48 months for accounting and bookkeeping services and the further sum of $2,000 computed at the rate of $500 per year for business consultations, preparation of income tax returns and other miscellaneous services. Adding these amounts makes $13,680 and deducting that sum from $27,245 leaves $13,565 for which judgment was entered against Snearly in favor of the plaintiffs.

The testimony shows that Amy Wolf was employed by plaintiffs as a clerk at the agreed salary of $150 per month until June 1, 1956, and for the agreed sum of $250 during the balance of the year of 1956. The court found this to be true. This amounted to $6,830. The court allowed her $1,200 for extra services, making a total of $8,030. She was in fact paid by Snearly the sum of $10,012.50, making an excessive payment of $1,982.50, for which the trial court awarded judgment against her in favor of the plaintiffs.

Snearly attempted to justify the payment of $27,245 to himself. He recapitulated the amounts due him by plaintiffs' Exhibit 8 which was introduced in evidence. This exhibit is based in the main on his recollection as to the number of hours which he spent at bookkeeping and other miscellaneous work at $7.50 per hour. He testified that he kept account as to the number of hours on calendars but that these calendars were destroyed after the first of each year. While he computed all the work at $7.50 per hour as shown by Exhibit 8, he admitted in his testimony that part of his work was done by his clerks at $3 per hour and that these clerks did some 30 to 50 percent of the work, later changing that percentage to 20 percent of the work. We have examined all the exhibits introduced in evidence. We find some of the discrepancies in Exhibit 8 as follows: What appears to be the income tax return of the Gillette Livestock Ex-

change for 1954 (Exhibit 2) states the amount for "accounting" to be $4,206.72 while Exhibit 8 shows the amount earned by services rendered to be $4,875. Exhibit 3, which purports to be the income tax return of the Gillette Livestock Exchange for the year 1955, shows for "accounting and clerking" the sum of $5,130. Exhibit 8 shows the amount for clerking that year to be $1,350, which would actually leave for bookkeeping and so forth the sum of $3,780 while on the contrary Exhibit 8 shows for bookkeeping and so forth (aside from the amount for clerking) the sum of $7,650 or a difference of nearly $4,000. Exhibit 4, which purports to be an income tax return for 1956, shows "accounting expense" $3,070, while Exhibit 8 shows a charge for the same year for the same work to be $6,265 or a difference of over $3,000. It is quite apparent from this that the attempt of Snearly to justify his claim for $27,245 has utterly failed.

The witness Mountain, a certified accountant in the State of Montana, testified that he was familiar with matters connected with sales rings in and about Miles City, Montana, and that the sum of $125 per month over and above the amount paid for clerking the sales would be a generous compensation for the work involved.

Counsel for the defendants has made no attempt to justify the amounts claimed by the defendants and sets out no figures in his brief to justify the charges which were made by them. He contents himself by pleading and asserting that the payments made to the defendants must be regarded as voluntary payments and that plaintiffs are estopped to make the claims which they make herein and cannot recover them herein. He contends that if the plaintiffs did not actually know of these payments they should have known of them, so we shall turn our attention to these assertions.

The evidence shows that the plaintiffs had absolute confidence in the honesty and integrity of Snearly. They authorized him to write all the checks in connection with

their business including checks to himself. The financial affairs of the plaintiffs were conducted in the main by H. F. Hockett who had but an eighth grade education and whose eyesight had been bad for some five years, making it difficult for him to read. Both plaintiffs testified that they knew little about bookkeeping. They further testified, and the trial court found, that they did not know of the overcharges made by Snearly and the payments made to Amy Wolf until they had the books audited in the spring of 1957 by Mr. Barlow, an accountant whose figures in the statement of his accounting showed that Snearly was overpaid the sum of $21,565 and Amy Wolf in the sum of $3,393.50. Plaintiffs testified that they first became suspicious of the amounts paid to the defendants in the fall of 1956 when Snearly made what are claimed to be overcharges at the Edgemont sales ring in which the plaintiffs were interested and that they were told of the overcharges by Dorothy Manke who was in charge of the office at that place. De Loss Hockett testified that he did not examine the accounts. H. F. Hockett testified that he received four operating statements from Snearly during the four years from 1953 to 1957, that he glanced at them, could not read very well, and Snearly was always too busy to go through the statements with him. These operating statements could not be found except one, Exhibit 17, which does not show any charges made by or payments made to Snearly. The following is part of the testimony of Snearly (QQ. 804, 811–814):

"Q. And did you actually send statements to Gillette Livestock Exchange showing so many hours that you had worked and so many hours that your associates had worked on their matters, multiplied by the charge per hour? Is that right? A. No, we didn't send statements to them.

\*　\*　\*　\*　\*　\*

"Q. Well, then, as far as the Hocketts are concerned, they never had any idea from month to month what you were charging, from any statements that you sent to the Gillette Livestock Exchange, did they? A. Well, they probably didn't know what their light bill was, either, or their phone bill, because they never did see any statements. I gave them back their statements of the bills that I paid and I don't think anybody ever looked at them.

"Q. Well, possibly that is true but, as a matter of accounting practice, isn't it normal to send statements to firms for which you do work even though you may be authorized to draw checks against their account? A. That's right.

"Q. Well, why didn't you do it in this case? A. I just didn't do it.

"Q. No reason for making the exception? A. No, no reason."

Though the petitions herein assert that the defendants acted wilfully and wrongfully in misappropriating the funds of the plaintiffs, the actions before us actually are substantially actions for money had and received or actions for an unjust enrichment. Did the facts outlined require the trial court to find in favor of the defendants as a matter of law? We think not. It may be that the plaintiffs were foolish in giving Snearly, their agent, free rein in writing checks against their bank account but that would be no justification for permitting the agent to retain the money which did not rightly belong to him. An agent acts in a fiduciary capacity and owes to the principal the utmost good faith. 3 C.J.S. Agency § 138. It was not the duty of the plaintiffs, or at least not the positive duty, to investigate and discover the various acts of the agent. On the contrary, it was the right of the plaintiffs to assume that their agent would act honestly with integrity and within the scope of his authority. In such case courts will hesitate to let the agent retain money not belonging to him. See Twining v. Thompson, 68 Cal.App.2d 104, 156 P.2d 29. In order that the doctrine of equitable estoppel, on which counsel for defendants

relies, can have any application, plaintiffs would, ordinarily at least, have to have knowledge of the actions of the agent. 31 C.J.S. Estoppel § 70. The trial court in this case found that this knowledge did not exist and we hardly think that under the circumstances shown herein the trial court was bound to apply this doctrine, nor can we say that the doctrine of voluntary payments applies in this case. Payments to the agent in this case were not made to him by the plaintiffs. The agent paid himself by drawing checks against the bank account of the plaintiffs. The only way in which plaintiffs could be bound by the actions of Snearly in drawing checks payable to himself would be by ratification with full knowledge of the facts which plaintiffs did not have, as found by the trial court. We discussed the rule of ratification of the actions of an agent to a considerable extent in McConnell v. Dixon, 68 Wyo. 301, 233 P.2d 877, and we think that the discussion in that case applies in the case at bar.

■ In the case at bar the parties expressly agreed on the compensation which Snearly was to receive for clerking the sales. There was no express contract to pay for extra work which Snearly did. However, Snearly was entitled to payment for extra work which was accepted by the plaintiffs and which was not contemplated in the contract relating to the clerking of the sales, and recovery thereof may be had on quantum meruit. 3 C.J.S. Agency § 191; 98 C.J.S. Work and Labor § 36. The burden of proof, of course, of the time spent by Snearly and the value thereof was on him. See Salisbury v. Credit Service, Inc., 9 W.W.Harr. 377, 39 Del. 377, 199 A. 674. It is somewhat difficult from the record before us to determine just what extra services Snearly performed. As we have already seen, the testimony of Snearly in this connection was wholly unreliable. He made four income tax returns, had some correspondence with the United States Department of Agriculture and apparently paid the parties working for the plaintiffs with checks written against the bank account of the plaintiffs. These items of work appear to be extra work not included in the item of clerking sales. The witness Mountain, as already stated, testified that all of the extra work which was done by Snearly was not worth over $125 a month. The witness lived in Montana, was acquainted with sales rings at Miles City, Montana, which is not a great distance from Gillette, and the value of the charges of an accountant made at Miles City would not be very much different from those in Gillette. The claim that the witness was incompetent to testify to the value of the charges at Gillette is not, we think, well taken and the court had a right to take that testimony into consideration. The court in addition, however, allowed Snearly the sum of $2,000 more than that testified to by the witness Mountain. Taking all of the evidence in this case into consideration, we think that Snearly cannot complain of the judgment against him in this case.

■ Much of what we have said applies to the action against Amy Wolf. There is considerable conflict as to the amount of salary that was to be paid to her. According to the testimony of the plaintiffs, particularly H. F. Hockett, the agreed salary to be paid to her was the sum of $6,830. The court accepted this testimony in that connection and we cannot interfere. The court allowed her an additional sum of $1,200 for extra work. Plaintiffs contended and testified that she was not entitled to that but they are not complaining of the trial court's action. Her counsel has not set out any figures or amounts to show that she was entitled to more. We cannot say that the trial court was wrong.

The judgments in both actions are affirmed.

Affirmed.