John G. HAGAR and Geraldine Hagar, husband and wife, Appellants (Defendants),

Bobby Dean Clark and Eldonna Clark, husband and wife; United Farm Agency of Wyoming, Inc., a Wyoming corporation; RLC Investments, Inc., a Missouri corporation; Scarlett Ebersberger; Roberta L. "Bert" Milton, and Rick Wilder (Defendants),

v.

William M. MOBLEY and Joyce T. Mobley, husband and wife, Appellees (Plaintiffs).

William M. MOBLEY and Joyce T. Mobley, husband and wife, Appellants (Plaintiffs),

v.

UNITED FARM AGENCY OF WYOMING, INC., a Wyoming corporation; Scarlett Ebersberger; and Roberta L. "Bert" Milton, Appellees (Defendants),

John G. Hagar and Geraldine Hagar, husband and wife; RLC Investments, Inc., a Missouri corporation; Rick Wilder; Bobby Dean Clark and Eldonna Clark, husband and wife (Defendants).

Nos. 5550, 5551.

Supreme Court of Wyoming.

Dec. 17, 1981.

F. M. Andrews, Jr., Andrews & Anderson, P. C., Riverton, for the Hagars.

David B. Hooper, Hooper & Hall, P. C., Riverton, for the Mobleys.

Robert M. Seipt and Timothy J. Judson, Seipt & Judson, Riverton, for United, Milton and Ebersberger.

Before ROSE, C. J., RAPER, THOMAS and ROONEY, JJ., and JOHNSON, District Judge.

RAPER, Justice.

This appeal arises from a district court's judgment ending a complex piece of litigation which had at its core an action to rescind a contract for the sale of a lakeside resort on the basis of fraudulent misrepresentation. The trial judge rescinded the contract and awarded damages of $94,849.96 representing a down payment and installments with interest to restore the buyers (Mobleys) to status quo. The parties to this appeal have raised, in effect, three distinct issues that require resolution. First, a challenge is made by sellers, John and Geraldine Hagar (Hagars), to the district court's decision to rescind the purchase contract; the charge is made that the decision was erroneous in light of both prior case law and the record in this particular

appeal. Second, we are called upon by the Mobleys as cross-appellants to determine whether the district court correctly dismissed the Mobleys' claim for damages against a real estate agency, United Farm Agency (United) and its broker and salesperson as a result of misrepresentations concerning the resort made by its real estate broker manager, Roberta Milton (Milton), and salesperson, Scarlett Ebersberger (Ebersberger). And finally, also at the instance of the Mobleys, we must review the district court's decision to award the Hagars, to the benefit of their predecessors in interest to whom a balance of their selling price was still owing, the proceeds of a fire insurance policy purchased by the Mobleys, which became payable during the pendency of the lawsuit following a fire at the resort.

We will affirm in part, reverse in part and remand for further proceedings with respect to the liability of United, Milton and Ebersberger, the realtors.

## I

On June 21, 1960, the Wyoming State Parks Commission, as lessor, executed a lease agreement with the S. J. Stanbury Company, lessee. The property covered by the lease consisted of approximately eighteen acres of land on Boysen Reservoir located in Fremont County near Shoshoni. The term of the lease was set at twenty-three years though an option to renew for an additional thirty years was provided Stanbury. In addition, the lease was expressly subject to the lease between the Parks Commission and the United States Government.

Further, Stanbury by the terms of the lease with the Parks Commission, amongst other provisions, promised and agreed:

"A. To assume responsibility for the prevention, control, and suppression of fires, and the preservation of law and order within the premises.

. * * * . * * *

"D. To keep and maintain the lands affected by this lease, including all improvements erected thereon, in a good and reasonable state of repair, reasonable

wear and tear excepted, and, at its own expense, to make all necessary repairs to preserve said improvements.

"E. To permit no activity which will interfere with the safety, protection, and efficient operations of the Boysen Reservoir."

Finally, the lease authorized Stanbury to sell, assign, or set over the lease to another only if the written consent of the Parks Commission was first obtained.

Pursuant to this latter authorization, the lease changed hands several times within the next six years. Then, in April 1967 an assignment to Bobby Dean and Eldonna Clark was approved by the Wyoming State Parks Commission. They retained their interest until July 28, 1975, at which time they executed an agreement to sell to the Hagars.

The Hagars took possession and operated the business establishment located on the property known as the Lakeside Resort until the summer of 1978. In May of that year the Hagars, after receiving an inquiry concerning the possibility of listing the leasehold for sale, met with real estate broker Milton, representing a branch office of United located in Dubois. At that meeting, the Hagars indicated that the lease would not expire until the year 2022 and that the net profit for the previous year had run around $50,000 to $60,000. They also promised to open their books for inspection "to a bona fide buyer." The meeting concluded with the Hagars having listed the resort for sale, with United as real estate agent.

In June, United sent out letters to those on a list of people interested in buying a resort. Mr. Mobley, as a prospect named on the list, received the following letter on the letterhead of United:

"Dear Mr. Mobley,

"Your name came to us from our customer service center in Kansas City as being interested in resorts for sale in our area. We currently have a fantastic business for sale in which you may be interested.

"This listing consists of 18 acres of land leased from the State of Wyoming for

just $600 per yezr [sic] and doesn't expire until 2022, at which time the lease may be renewed for 25 year periods. The land borders Boyson [Boysen] Resevoir [sic]. "The business consists of a 57 unit trailer park, four units of which are for permanent trailers, the other 53 for smaller trailers with electricity and water hookups. Trailer park also has two restroom facilities, one with showers. There is also a 4-unit motel with very attractive attached living quarters.

"The main building houses a bar, liquor store, bait shop, private office area, lounge, dining room and coffee shop. There are also three self-serve gas pumps and a large storage building on the property.

"There is all electric heat, an artesian water well and two septic tanks on the property. The owners have a live-bait permit allowing them to sell minnows to fisherman. All equipment is in good condition and a complete inventory goes with the business.

"The owners yielded a very substantial net income, and books are open to a bona-fide buyer. The selling price is just $230,000 with possible owner financing. If you would like more information, or would like to make arrangements to see this property, please let us know at your earliest convenience.

"Sincerely,
/s/ Scarlett Ebersberger
Scarlett Ebersberger
Associate"

The Mobleys contacted United and expressed interest in the resort. Arrangements were made for the Mobleys to tour the property. On June 11, 1978, the Mobleys met the two United agents, Milton and Ebersberger, as well as Mr. Hagar, at the resort and went over the premises.

On June 25, 1978, the Mobleys again met with United's agents, Milton and Ebersberger. Though that meeting was primarily held to discuss the listing of property owned by the Mobleys, mention was made of the Hagars' Lakeside Resort. As to the content of that conversation, the evidence is in conflict. In her testimony, Milton claimed that she had a copy of the Stanbury lease with her at the June 25 meeting and that she offered to let the Mobleys read it. However, Mr. Mobley testified that at that meeting Milton indicated that she had not yet received a copy of the lease though she had heard from the Wyoming State Parks Commission that it was unreadable.

In reliance upon the representations made to them concerning the resort, the Mobleys submitted a purchase offer on June 27, 1978. Following some negotiations, the deal was closed July 13, 1978. On June 15, 1978, the Hagars had received a letter from the Wyoming Recreation Commission (successor to the State Parks Commission [1]) iterating that the lease was due to expire on June 20, 1983. The Hagars thus knew or should have known from their experience with the lease and the June 15, 1978 notice from the Commission prior to consummation of the sale, the true expiration date of the lease. The Hagars' income tax records in evidence reflect that for each of the years that they operated the Lakeside Resort, the business lost money.

In June 1979 the Clarks received a communication from the Wyoming Recreation Commission concerning the Lakeside Resort:

1. Section 36-4-119(a), W.S.1977:

"(a) Upon the effective date of this act the Wyoming recreation commission shall be bound by any and all agreements, contracts and obligations incurred by the Wyoming state parks commission and land and water conservation commission and Old South Pass historical preserve commission prior to the effective date of this act and shall succeed to all records, documents, equipment, and other personal or real property under the control and management of the parks commission of Wyoming and the state land and water conservation commission of Wyoming and the Old South Pass historical preserve commission of Wyoming acquired and used in the performance of duties previously imposed upon those commissioners. All money from operation of the Old South Pass historical preserve shall be credited to the general fund."

"Dear Mr. and Mrs. Clark:

"Because the lease fee for this Concession Lease was not paid on time, we had cause to inspect our file on this lease.

"We find the lease is being held in escrow by the First National Bank of Riverton and cannot be assigned. However you executed a Sales Contract to Mr. and Mrs. John Hagar in July, 1975. Written permission was given to you to execute the Sales Contract with Mr. and Mrs. Hagar; however, no lease assignment could be executed to show change of lessee. In July, 1978, we received from a real estate broker an almost unreadable copy of a Sales Contract from Mr. and Mrs. Hagar to William and Joyce Mobley. Perhaps because of lack of knowledge of the contents of the Lease, the Hagars sold their interest but the Wyoming Recreation Commission issued no written permission for this transfer and no assignment forms could be executed.

"As far as the Wyoming Recreation Commission is concerned, you are the Lessee for this area—the Lessee of Record—and ultimately you are financially responsible for the lease fee and for the maintenance of this concession area.

"The area has not been kept up in a presentable manner. [An inspection report was attached to identify the problem areas.]

"We feel it only fair to alert you to the fact that the term of this Lease ends June 21, 1983. However, there is a clause in the original lease denoting failure to comply with the conditions of this lease and the State Parks Commission (Wyoming Recreation Commission) may terminate this lease with 60 days written notice to the Lessee.

"Article 5 states the Lessee will submit detailed plans for all proposed construction and said plans shall be approved prior to the beginning of any construction. In many instances this Article has not been complied with.

"Article 11 states the Lessee may not assign, or set over this lease to any person, persons, or corporation, without the written consent of the State Parks Commission (Wyoming Recreation Commission) and further agrees that any and all subleases made by the Lessee shall comply with the terms of this lease[.]

"This office must have a certified statement from you, stating who the current sub-lessee is, names, addresses, and terms of the sub-lease. The sub-lessee must be furnished with a copy of the lease and its amendments and assignments, which you stated you would do.

"We have received a check for $600.00 from the Mobleys on June 21, 1979, for the March, 1979, lease fee.

> "Sincerely,
> /s/ Jan L. Wilson
> Jan L. Wilson
> Director"

This letter triggered a series of demands and cross-demands between the Clarks, the Hagars and the Mobleys, that the necessary repairs and improvements be made. In August 1979 the lawsuit out of which this appeal arises was initiated by the Mobleys against the Hagars, the Clarks, United, Milton, Ebersberger, and some others. The Mobleys charged that fraudulent misrepresentations had been made to them which induced their purchase of the resort. Rescission of the purchase agreement was sought as well as damages.[2]

The case proceeded to trial to the court on October 27, 1980. The court found that the Hagars had made to the Mobleys intentional and material misrepresentations of fact concerning the Lakeside Resort in order to sell it to them. Accordingly rescission of the purchase contract was ordered as well as the payment of certain sums in an attempt to make the Mobleys whole again. As necessary, other facts and pertinent aspects of the district court's determinations will be discussed later.

---

**2.** Cross-claims were filed making the litigation exceedingly complex, however this appeal only raises issues connected solely with the Mobleys' claims against the Hagars and the real- tors. Further, discussion of the entire case before the district court would be counterproductive.

## II

The rescission of a contract is in effect a repeal or a nullification of a contract. When it is granted, the contract is annulled and the parties are restored to status quo; that is, an attempt is made to place the parties in the positions they would have been in, but for the contract. See 17 Am. Jur.2d Contracts § 512 (1964).

Rescission developed in England as an equitable remedy that was granted to a party who had been fraudulently induced into entering a contract. See Pomeroy, Equity Jurisprudence, §§ 112 and 872 (1941). However, the equitable conception of fraud was never clearly defined. Like most equitable doctrines its invocation rested primarily upon notions of fair play and good faith. Pomeroy, supra, § 873.

However, this court and the courts in our sister states have, with the passage of time, attempted to articulate distinct rules to govern the employment of rescission as a remedy for fraudulently inducing the execution of a contract. As this court has noted in a previous case, there are elements necessary to the establishment of an actionable fraud. Basically, first the claimant must show that false representations of material fact were made to him; second, he must demonstrate reliance thereon; and third, detriment to him as a result. *Davis v. Schiess*, Wyo., 417 P.2d 19 (1966). Expressed somewhat differently in *Johnson v. Soulis*, Wyo., 542 P.2d 867, 872 (1975), it is said that the asserted false representation must be one which is made to induce action, and that it must be reasonably believed by the plaintiff to be true. Further, the claimant bears the burden of proving these elements in a clear and convincing manner. See also, *White v. Ogburn*, Wyo., 528 P.2d 1167 (1974).

In *Meeker v. Lanham*, Wyo., 604 P.2d 556 (1979), this court observed that, in the case of the sale of an interest in land, misrepresentations concerning the boundaries of the property are actionable. The intent of the seller, when making the misrepresentation, is irrelevant. A false, though innocent, assertion of the property's boundary may be sufficient to warrant rescission. *Kackley v. Webber*, 310 Ky. 285, 220 S.W.2d 587, 9 A.L.R.2d 500 (1949). The policy behind this rule is to allow a purchaser to rely upon the seller's representations as to what constitutes the land being purchased. It is designed to encourage trust and expedite business transactions. For example, the buyer, to protect himself, should not have to go through the time and expense of having the land surveyed. *Dugan v. Jones*, Utah, 615 P.2d 1239 (1980). In *Lawson v. Schuchardt*, Wyo., 363 P.2d 90, 93 (1961), it was said: "It must be noted that the doctrine of caveat emptor is employed by modern courts under new standards of business ethics which demand that statements of fact be at least honestly and carefully made." *Byrnes v. Mutual Life Insurance Company of New York*, 217 F.2d 497 (9th Cir. 1954), cert. denied 348 U.S. 971, 75 S.Ct. 532, 99 L.Ed. 756.

The policy which supports this rule for misdescription of a parcel of land boundaries applies with equal force to all misrepresentations of the estate, interest or extent of property. *Ryan v. Brady*, 34 Md. App. 41, 366 A.2d 745 (1976); *Chesapeake Homes, Inc. v. McGrath*, 249 Md. 480, 240 A.2d 245 (1968). Therefore, we distill from all the above authority that before a buyer may have a contract rescinded and restitution made, he must prove in a clear and convincing fashion that one, the seller misrepresented the interest in land which was being sold, in a material and substantial aspect; two, the buyer relied upon the false representation; and three, as a result the buyer suffered injury.

In this case the evidence is clear that the length of the lease being transfered was substantially shorter than the representations made to the Mobleys on behalf of the Hagars. The difference between a lease which expires within five years but allows an option for a thirty-year renewal, and one which expires in forty-five years but grants options to renew every twenty-five years, is substantial and material. The Mobleys were purchasing less than half of what they thought they were

purchasing. The evidence is also clear that the Mobleys relied upon the representations of the length of the lease made to them by the Hagars. They did not see the lease prior to the closing on the sale. They trusted the Hagars' representations.

On appeal the Hagars are now heard to say that this court should hold that the Mobleys had a duty to investigate the representations made by the Hagars; that we should punish the Mobleys for being naive and trusting and put the burden on their backs of assuring the honesty of the sellers. They base their argument on language found in *White v. Ogburn*, supra at 1171 to the effect that:

> " * * * We do not say that plaintiffs could not rely upon representations made to them by the defendants, but they could not blind themselves to observe the readily available facts and place reliance upon such alleged misrepresentations without making a diligent inquiry of these facts * * * "

However, in that passage this court was merely saying that when a party has been made aware of some inconsistencies between the facts and the representations of the other party, some investigation is called for and required. Here, the Mobleys had no inkling that the Hagars' statements were false; and accordingly they had no duty to investigate further. See *Dugan v. Jones*, supra, 615 P.2d 1239.

Finally, the Mobleys clearly demonstrated an injury. They received substantially less than they bargained for by reason of material misrepresentations. Thus they carried their burden of proof and were entitled to a rescission of the contract and restitution. The trial court obviously followed the law as we have outlined it, consistent with our approval of §§ 28 and 150, Restatement, Restitution (1937):

Section 28:

"A person who has paid money to another because of a mistake of fact and who does not obtain what he expected in return is entitled to restitution from the other if the mistake was induced:

"(a) by the fraud of the payee, or

"(b) by his innocent and material misrepresentation, or

"(c) by the fraud or material misrepresentation of a person purporting to act as the payee's agent, or

"(d) by the fraud or material misrepresentation of a third person, provided that the payee has notice of the fraud or representation before he has given or promised something of value."

Section 150:

"In an action of restitution in which the benefit received was money, the measure of recovery for this benefit is the amount of money received."

Those black-letter rules from the Restatement also square with § 376, Restatement, Contracts 2d (1981):

"A party who has avoided a contract on the ground of lack of capacity, mistake, misrepresentation, duress, undue influence or abuse of a fiduciary relation is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance."

The Hagars' final point that the district court erred, in not finding a breach of contract by the Mobleys, does not merit discussion. The court rescinded the contract; it voided all obligations due under it. Thus, the Mobleys could not have breached what did not exist.

### III

As to the Mobleys' claim against United and its agents Milton and Ebersberger, facts in addition to those already discussed should be noted. As mentioned earlier, after Milton succeeded in convincing the Hagars to sell their leasehold and list it with United, she and Ebersberger sent out letters to a list of prospective buyers—including the Mobleys. The same false representations made by the Hagars to Milton and Ebersberger were repeated in that letter.

On June 25, 1978, after the Mobleys had expressed interest in the resort and had even toured it, agents Milton and Ebersber-

ger, along with Rick Wilder,[3] another employee of United, visited the Mobleys in Casper to discuss financing. Milton testified concerning that meeting:

"Q. If I understand correctly, the purpose of this meeting on June 25 was to inspect their property in Casper to see if it was sufficient equity that RLC could make a loan against the property?[4]

"A. Well, yes and no. Scarlett [Ebersberger] and I were under the impression that we were going to obtain an offer on Lakeside. We took our district manager, Rick Wilder, with us because he was the one we felt was best able to propose and explain the formalities of a potential loan from RLC, if they were to make that offer for Lakeside.

"Q. Did you take anything with you when you went to Casper?

"A. We took some listing forms and we took some purchase offers. *We took the copy of the lease that we had received from Mrs. Wilson with the Recreation Board on Lakeside.* [Emphasis added.]

\*   \*   \*   \*   \*   \*

"Q. What happened then?

"A. We arrived at about ten or ten thirty in the morning. Mr. Mobley had to go complete or discuss a job or some nature of his business.

\*   \*   \*   \*   \*   \*

"A. Mrs. Mobley and Scarlett and Rick and myself spent, probably, an hour and a half or so looking at their Casper property. One of the criteria for RLC loaning customers money is they have to have some collateral, some assets. In this case it seemed to be that the Casper property was that asset. So while we were there, we thought why not look at it and this type of thing. Sort of kill two birds with one stone, in that sense. \* \* \*

"Q. Now, when you say you discussed the properties at length, and with reference to Lakeside, what in particular did you discuss?

"A. With reference to Lakeside?

"Q. Yes.

"A. Mrs. Mobley's main concern was how soon did they receive the money from RLC so that they could make an offer on Lakeside.

"Q. Was anything discussed concerning the income of Lakeside at this meeting?

"A. Not that I recall, no.

"Q. Was anything discussed concerning the lease on Lakeside?

"A. We informed the Mobleys that we had, in fact, received a copy of that lease from the state, that it wasn't all that legible, but we had brought it down and if they were interested in reading it, they could.

"Q. Did you tell them anything in particular about the lease?

"A. I didn't.

\*   \*   \*   \*   \*   \*

"Q. Was there any further conversation about possible financing by RLC?

"A. I believe Mr. Wilder explained to the Mobleys what they would have to have done as far as an appraisal, have a title search done to make sure there were no other liens against the property or if there were that they did not exceed the amount that RLC would be interested in loaning and this type of thing.

\*   \*   \*   \*   \*   \*

"Q. What about repayment of the loan itself?

"A. They had anticipated that their Casper property would probably sell within the year. I believe their loan with RLC was for a year. They had anticipated the sale of that property in which to pay off that loan.

"Q. Did they have their property for sale?

"A. I don't know if they did. Obviously they didn't have it for sale the day that we visited with them in Casper on June 25 because they indicated that they would like to list that property with United."

---

**3.** Although Rick Wilder was named a defendant in this action, he is not a party to this appeal.

**4.** Rick Wilder also testified that RLC Investments was a subsidiary of United.

By the end of the meeting, the Mobleys had signed a listing agreement with United Farm for the sale of their Casper property; and agents Milton and Wilder were working on arranging financing through RLC Investments for the Mobleys so that they could purchase the Hagars' Lakeside Resort.

Meanwhile agent Milton had received information which should have apprised her of problems with the Hagars' claims concerning the leasehold. First, on June 15, 1978 she received a copy of the Stanbury lease from the Wyoming Recreation Commission. The Mobleys claim that they were never given an opportunity to see the lease nor told of its contents. Milton claims that, after she had read and failed to understand it, she offered to show the lease to the Mobleys but indicated to them it was illegible anyway. The lease was not illegible, and in fact to someone who has placed himself or herself before the public as knowledgeable in the field, the lease should have been fairly clear, or at least clear enough to show that the number of years until the lease expired did not quite add up the way the Hagars claimed.

Second, on June 19, 1978 Milton met with Dean Clark, the Hagars' predecessor in interest. Clark testified about their conversation as follows:

"Q. Mr. Clark, did you have a meeting with Roberta Milton in June of 1978?

"A. Yes. I did.

＊　　＊　　＊　　＊　　＊　　＊

"Q. Do you recall what the occasion for the meeting was?

"A. She wanted to discuss Lakeside.

＊　　＊　　＊　　＊　　＊　　＊

"Q. What happened on that occasion?

"A. She was very concerned over the lease, one. She couldn't understand how come this lease was in S. J. Stanbury's name and not my name. So we discussed the lease, went over it thoroughly. She wanted to know what kind of terms and conditions I would set down to consent to sale and I told her I wanted my money and I told her if somebody didn't do

something pretty quick, there wouldn't be a Lakeside Resort left.

"Q. Why did you say that?

"A. Because it was being destroyed out there.

"Q. When you say 'it was being destroyed', can you be a little more specific? What was just being destroyed?

"A. The testimony bore out the fact that the lawn was dead. There were paint signs on the building. The fences were laying down. The trees were dying. Planters were being torn down. The inside of the building was [in] [dis]array. The carpet was full of grease. The kitchen was filthy. Lights were unreplaced. The zoo, the doors were fallen out of the cages. The animals were dead or gone. Trash and weeds was accumulating in the pond area. Electrical wiring was showing. There had been electrical hookup stalls knocked over and left lay. Bear [sic] wires exposed. Really.

＊　　＊　　＊　　＊　　＊　　＊

"Q. Was there any conversation with Mrs. Milton regarding the term of lease or the expiration date of the lease?

"A. Yes. We went over the entire lease.

"Q. What was discussed, specifically?

"A. How much problem there would be, would there be any problem with the Recreation Commission in getting it renewed.

"Q. What was said in that respect?

"A. I told her it would be up to the Recreation Commission if the property didn't meet their approval, that they might not approve it and that's why it was so important to do something."

Milton admitted at trial that, though Clark had warned her that the Hagars were ruining the place and may have been in violation of the lease, she did not relay the information to the Mobleys. In response to a question asking why, Milton stated:

"A. I was representing the Hagars in this instance as a representative for the sellers. There are certain relationships that a broker and their seller have that

pertain to them and if they don't really have that much to do with the sale, really aren't anybody's elses business because Mr. Clark told me that he was unhappy with the Hagars, that it was his impression that the place was deteriorating and had gone down hill and whatnot. I'm not sure it's my obligation to report that to a potential buyer when I don't know that to be a fact."

The district court tried the Mobleys' claim against the realtors and permitted evidence in that connection, but in its judgment it found no duty upon the realtors as a matter of law. In its conclusion of law in that regard it ruled that:

"5. The defendant real estate agency and its agents and brokers, to-wit: United Farm Agency of Wyoming, Inc., Scarlett Ebersberger, Roberta L. 'Bert' Milton and Rick Wilder, should be dismissed from the complaint as they only repeated representations made to them by the Hagars concerning the lease term and profitability of the Hagars operation of Lakeside Resort and had no independent duty or obligation to inquire into the truthfulness or accuracy of these said representations."

The legal conclusions of the trial court are not binding on this court. *Matter of North Laramie Land Company,* Wyo., 605 P.2d 367 (1980). The trial court's conclusion of law was error as to the duty of realtors toward buyers.

### IV

■ Real estate brokers and salesmen are licensed by the State of Wyoming and required to meet high standards of honesty, integrity, trustworthiness and competency. Theirs is a regulated profession. Failure to satisfy those standards is ground for suspension or revocation of a real estate broker's or salesperson's license. An act licensing real estate agents must be construed in the light of an obvious purpose of protecting the public in the handling of important and valuable transactions relating to real property. *Toavs v. State,* Wyo., 635 P.2d 1172 (1981). As a result, such an agent does

not stand in the same shoes of a lay vendor. Such realtors owe the vendee the same duties of integrity owed the public at large. They must be honest, trustworthy and competent.

As was said in *Zichlin v. Dill,* 157 Fla. 96, 25 So.2d 4 (1946):

"Ultimately we must determine just what duty the broker owed appellant. Did he owe a duty to any one except the owner who had listed the property? Evidently the chancellor was of the view that he owed no duty to the buyer. In this he was in error. Generally speaking an agent is responsible only to his principal. This, however, is different. The broker in Florida occupies a status under the law with recognized privileges and responsibilities. The broker in this state belongs to a privileged class and enjoys a monopoly to engage in a lucrative business. See Sec. 475.01 et seq., Fla.Stat., '41, F.S.A. The statute requires that (475.17): '* * * all applicants who are natural persons shall be competent, honest, truthful, trustworthy, of good character, and bear a reputation for fair dealing. * * *'

"The state, therefore, has prescribed a high standard of qualifications and by the same law granted a form of monopoly and in so doing the old rule of caveat emptor is cast aside. Those dealing with a licensed broker may naturally assume that he possesses the requisites of an honest, ethical man." 25 So.2d at 4–5.

An enlightening case is *Dugan v. Jones,* supra. There an agent for United (coincidentally, apparently part of the same organization as in the case before us) took an exclusive listing for a store and the supposedly twenty-two and three-quarter acres on which it was located. The agent repeated this description in a United catalog and further observed that the property had a quarter-mile river frontage with twelve acres of native pasture and eight acres of irrigated improved pasture. After the Joneses purchased the property, they discovered that most of the land was under the river, leaving them with about six and nine-tenths usable acres. They counter-

claimed against the vendor when he tried to foreclose and filed a third-party complaint against the realtor. The case was tried to the court who found against the Joneses and dismissed their claims. On appeal the case was reversed.

As to the claim against the realtor, the Utah Supreme Court said:

"In this state, it is apparent that the rule of caveat emptor does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public." 615 P.2d at 1248.

The case was then remanded in order for the trier of fact to determine whether the realtor had negligently, recklessly, or intentionally breached his duty.

The Montana Supreme Court has also recently held that real estate brokers have, like other professionals, certain standards of care which must be satisfied. That court observed that the failure to maintain those standards of skill, competency and integrity exposes realtors to, in effect, malpractice actions. *McCarty v. Lincoln Green, Inc.*, Mont., 620 P.2d 1221, 1225 (1980). In that case the court, while affirming a district court's judgment holding a realtor liable to the vendee for showing him the wrong property, said:

"\* \* \* No standard could be countenanced by the real estate brokers' profession, accepting as a reasonable standard of care the showing of the wrong property on behalf of a prospective seller to a prospective purchaser." 620 P.2d at 1225.

Thus it can be seen that the realtor's duty is to an extent determined by public policy.

■ Our legislature has elucidated this state's policy in § 33–28–111, W.S.1977.[5] It is clear that we may exact a high standard of care from realtors. In *Distad v. Cubin*, Wyo., 633 P.2d 167 (1981), this court held that a standard of care may be adopted by the court from a legislative enactment. We adopt the legislative policy of § 33–28–111, W.S.1977 as the standards by which licensed brokers and salesmen may be held liable to purchasers.

■ Thus we conclude that as to a real estate broker's duty to the general public:

"\* \* \* The correct rule is that the broker is liable because of material representations of the principal if he repeats them and knows, or reasonably should know, of their falsity. [Citations.] Liability attaches in this context on grounds of negligence. [Citations.]

"A real estate broker owes a fiduciary duty of undivided loyalty to his principal, usually the seller, of course. [Citation.] The underlying rationale of his duty to a

---

5. Section 33–28–111, W.S.1977, in pertinent part:

"(a) The commission may upon its own motion, and shall, upon verified complaint in writing of any person setting forth a cause of action under this section, ascertain the facts and if warranted hold a hearing for the suspension or revocation of a license. The commission shall have power to refuse a license for cause or to suspend or revoke a license where it has been obtained by false representation or where the licensee in performing or attempting to perform any of the acts mentioned herein is found guilty of:

"(i) Making any substantial misrepresentation; or

"(ii) Making any false promises of a character likely to influence, persuade, or induce; or

"(iii) Pursuing a continued and flagrant course of misrepresentation, or making false promises through agents or salesmen or any medium of advertising, or otherwise; or

"\* \* \* \* \* \*

"(vii) Violating any reasonable rule or regulation promulgated by the commission in the interests of the public and in conformance with the provisions of this act [§§ 33–28–101 to 33–28–117]; or

"(viii) Failing to furnish a copy of any written instrument to all parties executing the same at the time thereof; or

"(ix) Any conduct in a real estate transaction which demonstrates bad faith, dishonesty, untrustworthiness or incompetency;

"\* \* \* \* \* \*

"(xiv) Failing to make known for which party he is acting or receiving compensation from more than one (1) party, except with the full knowledge of all parties."

buyer who is not his client is that he is a professional who is in a unique position to verify critical information given him by the seller. His duty is to take reasonable steps to avoid disseminating to the buyer false information. [Citations.] The broker is required to employ a reasonable degree of effort and professional expertise to confirm or refute information from the seller which he knows, or should know, is pivotal to the transaction from the buyer's perspective." *Tennant v. Lawton*, 26 Wash.App. 701, 615 P.2d 1305, 1309–1310 (1980).

See also, Annot., 81 A.L.R.3d 717 (1977), "Real Estate Broker's Liability for Misrepresentation as to Income from or Productivity of Property."

██ Milton, a licensed broker, Ebersberger, a licensed salesperson, and United, their licensed employer, had duties to the Mobleys; and the district court was in error when it held to the contrary. This is particularly true since agent Milton had read the lease involved while agent Ebersberger admitted to skimming it; that should have apprised them of the terms of the lease. Further, broker Milton was even notified by Mr. Clark of his concerns regarding the lease. As professionals, the realtors in this case should have at least realized something was amiss; and their statutory duty, arising from the standards we find to be the law, required them to pass the information along.

██ Realtors, just like doctors, lawyers, engineering consultants, and builders, hold themselves out as professionals; it is their job to know their profession. People rely on and trust them. Failure to comply with either the accepted standards in the field or the standards society is willing to recognize as acceptable, is actionable.[6]

Even in the absence of the special position of exposure to liability that realtors have, which is our holding, the general law of agency would cover the tortious conduct of real estate persons. The posture we have taken is consistent with § 348, Restatement, Agency 2d (1958):

"An agent who fraudulently makes representations, uses duress, or knowingly assists in the commission of tortious fraud or duress by his principal or by others is subject to liability in tort to the injured person although the fraud or duress occurs in a transaction on behalf of the principal."

As said in comment "a" to that section:

"* * * Not only is an agent who knowingly makes misrepresentations subject to liability to the other party, but an agent who assists another in the misrepresenta-

---

**6.** There is another aspect of this case which is disturbing. Did the realtors, during the course of negotiations, become agents of the buyers? In addition to the duties a realtor owes to the public at large, duties may arise based upon the realtor's relationship to a particular individual or organization. Where s/he becomes a vendor's or vendee's agent a high standard of care comes into play. When such occurs, the duty the realtor owes to his/her client is in the nature of a fiduciary. *Black v. Dahl*, Alaska, 625 P.2d 876 (1981). Their relationship is governed by the rules of law applicable to principal and agent which impose the same obligations on the realtor as are imposed upon a trustee in favor of his beneficiary. *Marcotte Realty & Auction, Inc. v. Melvin Schumacher & Schumacher Brothers, Inc.*, 229 Kan. 252, 624 P.2d 420, 428 (1981). An agent is a fiduciary who owes to the principal the utmost good faith. *Snearly v. Hockett*, Wyo., 352 P.2d 230 (1960). A real estate broker has been found to have breached this duty where he failed to ascertain that the corporation his client wished to purchase was in arrears on important monthly obligations, and in fact represented to his client that the corporation was solid. *Fitzgerald v. Edelen*, Colo.App., 623 P.2d 418 (1980), cert. denied (1981). Accordingly, it can be said that the law requires a real estate agent to not only refrain from taking advantage of a client, but also act with the utmost good faith and disclose any material facts ascertainable by the agent which may affect the client's decision to purchase or sell, as the case may be. *Flemmer v. Ming*, Mont., 621 P.2d 1038 (1980).

In this case, because of Milton's actions toward the Mobleys in helping them get financing and in agreeing to list the property being used as collateral and to eventually pay off the loan, there exists a question of fact as to whether she and her employing agency, United, were also the Mobleys' agents. And even if the trier of fact was able to conclude that she was not their agent, there is the question of whether she adequately informed the Mobleys that she was working exclusively for the Hagars. See § 33–28–111(a)(xiv), supra, fn. 5.

tions is also subject to liability. Thus, an agent who enters into transactions with a buyer knowing that the buyer is relying upon the previous misrepresentations by the principal or another agent is liable to the same extent as if he had made the previous misrepresentations. * * * "

The contract has been rescinded and restitution ordered. There are flags of warning in the evidence that the realtors may have breached the duty we have confirmed, to disclose material information to the Mobleys. The trial court's findings and conclusions were affected by an erroneous view of the law.

The liability of real estate agents, brokers and salespersons, as in all actions predicated upon the failure to perform some duty, sounds in tort.. In tort cases damages are generally awarded in order to compensate claimants for loss. The measure of damages is the amount which will compensate for all the detriment proximately caused by the breach of duty. *Douglas Reservoirs Water Users Assoc. v. Cross*, Wyo., 569 P.2d 1280 (1977). In *McCarty v. Lincoln Green, Inc.*, supra, 620 P.2d 1221, the Montana Supreme Court affirmed an award of damages against a negligent realtor which had been measured according to all detriment proximately caused by the tort.

### VI

The Mobleys claim that the judgment should have been joint and several against the Hagars and the real estate defendants and each of them. To the extent that the acts of each contributed to any tort causing the Mobleys damage, there may be liability. Every tort is complete in itself, and all who participate in its commission are jointly and severally liable for the harm resulting therefrom. Recovery may be had against one or more joint tortfeasors sued jointly. *Mau v. Stoner*, 15 Wyo. 109, 135, 87 P. 434 (1906), reh. denied 15 Wyo. 135, 89 P. 466; 86 C.J.S. Torts §§ 35 through 37, including those arising out of a contractual relationship, C.J.S., supra, § 36. In determining the liability of the corporate

appellee, United, the applicability of the doctrine of respondeat superior must be considered. The realtor persons including United may be jointly and severally liable for restitution. The district court never reached this question. We call this law to the attention of the district court because these questions are likely to arise upon a reconsideration of the record or a new trial, which we are directing as hereinafter set out. *McGuire v. McGuire*, Wyo., 608 P.2d 1278 (1980); *Chicago and North Western Railway Company v. City of Riverton, Fremont County*, 70 Wyo. 119, 247 P.2d 660 (1952).

### VII

While we have decided what law is applicable to the liability of real estate brokers and salespersons and their corporate employers, we have not made the final factual determination applying that law. We are not fact finders. The trial court stopped short of considering the law and the evidence we have pointed up, and there may be more evidence available in the light of the law we announce. When the trial court fails to find on material issues, a reviewing court normally vacates the judgment and remands the case for appropriate findings to be made. *Shores v. Lindsey*, Wyo., 591 P.2d 895, 902 (1979), citing 9 Wright & Miller, Federal Practice and Procedure: Civil § 2577.

As a corollary to that rule, findings derived from the application of an improper legal standard cannot stand. 9 Wright & Miller, supra, § 2585, footnote 7. We therefore must vacate the findings of fact, conclusions of law and judgment as to United, Milton and Ebersberger and remand to the district court for a reconsideration of the evidence and the making of findings of fact, conclusions of law and judgment consistent with the law herein set out. We understand that since the trial judge in this case is now a member of this court and unable to perform those duties, another must be assigned; he was not sitting in his own district. Accordingly, if any other judge assigned is satisfied that he cannot

perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial on those issues. Rule 63, W.R.C.P.[7] See also, Annot., 22 A.L.R.3d 922, "Power of Successor or Substituted Judge, in Civil Case, to Render Decision or Enter Judgment on Testimony Heard by Predecessor." If necessary to a complete and final decision, within the discretion of the trial judge, additional evidence may be taken.

### VIII

As noted earlier, the Clarks were the Hagars' predecessors in interest. During the time period they were in possession of the resort they obtained a loan from the First National Bank of Riverton. In the security agreement the resort was named as collateral, and the Clarks were required to keep the improvements on the leasehold insured for the benefit of the bank.

The Hagars, under their purchase agreement with the Clarks, agreed to keep the leasehold and its improvements insured, and name the Clarks as loss payees. In turn, the Hagars required the Mobleys in their purchase agreement to maintain the insurance coverage for the Clarks' benefit. The Mobleys did purchase two insurance policies for the premises with a total coverage of $76,000.00. However, the policies named RLC Investments as loss payee. RLC has not appealed.

On or about February 1, 1980 the Lakeside Resort burned. It was declared a total loss, and the full $76,000.00 became payable. An action was initiated by the Hagars on February 19, 1980 seeking to have the court declare the rights of the various parties to the fire insurance proceeds. That action was consolidated with the action for rescission and damages.

In its judgment the district court ordered:

"2. That the insurance proceeds on deposit with the Clerk of Court in the amount of $76,000 plus accrued interest be paid upon entry of this Judgment to the defendants, Bobby Dean Clark and Eldonna Clark, provided, however, that said defendants pay to the defendant, First National Bank of Riverton, Wyoming, the present balance owing on the parties' SBA loan with said Bank, said sum to be determined by counsel for both parties and a stipulation pertaining to said sum entered before payment of the proceeds to said defendants. Provided, further, that the sum of $76,000 plus accrued interest shall be credited against the balance due under the Hagar-Clark Agreement of July 28, 1975."

On appeal the Mobleys challenge the district court's holding that they are not to receive the proceeds of the insurance policy for which they paid. Though they succeeded in getting the purchase contract rescinded, they want this court to rule that they were also entitled to the money representing the improvements on the leasehold. However, we hold that they are not entitled to both, and the insurance money should go to the holder of the security interest on the buildings destroyed.

The very essence of rescission of a contract is a cancellation of the contract and a restoration of the parties to the positions they occupied prior to execution. See *Gaido v. Tysdal*, 68 Wyo. 490, 235 P.2d 741 (1951):

"* * * An attempted restoration of the status quo is an essential part of the rescission of a contract, and in accordance with the general rule requiring restoration, a party cannot rescind and at the same time retain the consideration, or a part of the consideration, received under the contract. One cannot have the benefits of rescission without assuming its

7. Rule 63, W.R.C.P.:
"If by reason of death, sickness, or other disability, a judge before whom an action has been tried is unable to perform the duties to be performed by the court under these rules after a verdict is returned or findings of fact and conclusions of law are filed, then his successor or any district judge designated by the Supreme Court may perform those duties; but if his successor or other judge so designated is satisfied that he cannot perform those duties because he did not preside at the trial or for any other reason, he may in his discretion grant a new trial."

burdens. The rule of restoration applies where a party wishes to rescind a contract for fraud or other cause, and applies even though a rescission agreement is silent as to restoration of the status quo. * * * " (Footnotes omitted.) 17 Am. Jur.2d Contracts § 512, p. 995.

Here the business on the leasehold burned down and could not be restored to the Hagars. The Mobleys had purchased insurance for the premises; the proceeds payable as a result were due as compensation for the destroyed buildings. But, since the contract was rescinded, the Mobleys were in effect never entitled to the buildings; the Hagars were. And thus the Hagars were the ones who should have the compensation for the loss, payable in accordance with their contract with the Clarks.

Further, but for the execution of the purchase contract, the Mobleys would never have purchased fire insurance coverage for the Lakeside Resort; the Hagars would have maintained their coverage. Accordingly, it only makes sense that, in cancelling the Mobley's purchase contract and restoring the status quo, the Hagars have the benefit of the insurance proceeds, as indicated.

The district court's judgment accomplished this. The proceeds were ordered paid to the First National Bank of Riverton, but both the Clarks and the Hagars received credit against their contractual obligations as if they had made the payments in transferring the money up the line to the bank. The Mobleys did not raise the issue that they should have received reimbursement for the cost of the insurance premium; this failure may have been to the benefit of the Hagars. We find no reversible error here.

Affirmed in part, reversed in part and remanded to the district court to vacate in pertinent part and revise its findings, conclusions and judgment, consistent with this opinion.

ROONEY, Justice, concurring.

Although I concur with the majority opinion, I want to record the fact that I do not approve Mobley's action in entering into an assignment of a lease without ascertaining the contents of the lease being assigned. Under most circumstances, such failure would negative a *reasonable* belief that a false representation is true. *Johnson v. Soulis*, Wyo., 542 P.2d 867 (1975). Caveat emptor should not be relaxed to the point of relieving the buyer of reasonable responsibility.