2001 WY 95

**Raymond M. HULSE and Kristina Hulse, f/k/a Kristina Bova, Appellants (Plaintiffs),**

v.

**FIRST AMERICAN TITLE COMPANY OF CROOK COUNTY, f/k/a First American Title Guaranty Agency of Crook County; First American Title Insurance Company; and BHJ, Inc., Appellees (Defendants).**

**First American Title Company of Crook County, f/k/a First American Title Guaranty Agency of Crook County, Appellant (Defendant),**

v.

**Raymond M. Hulse and Kristina HULSE, f/k/a Kristina Bova, Appellees (Plaintiffs).**

Nos. 99–256, 99–265.

Supreme Court of Wyoming.

Oct. 12, 2001.

Rehearing Denied Nov. 20, 2001.

---

Stephen H. Kline of Kline & Jenkins, Cheyenne, WY; and Michael P. Reynolds and Brad A. Schreiber of Quinn, Day & Barker, Rapid City and Belle Fourche, SD, respectively, Representing Appellants Hulses. Argument by Mr. Schrieber.

Barry G. Williams and Kevin D. Huber of Williams, Porter, Day & Neville, Casper, WY, Representing Appellee First American Title Co. Argument by Mr. Williams.

James R. Bell and Kathleen J. Swanson of Murane & Bostwick, Casper, WY, Representing Appellee BHJ, Inc. Argument by Ms. Swanson.

Before LEHMAN, C.J., and GOLDEN, HILL and KITE, JJ.

LEHMAN, Chief Justice.

[¶ 1] In these consolidated appeals we first determine the manner in which a private road, established pursuant to Wyo. Stat. Ann. § 24–9–101 *et seq.*, is vacated. We will then analyze the effect our determination has upon the plaintiffs' causes of action.

[¶ 2] In case number 99–256 plaintiffs/appellants Raymond and Kristina Hulse appeal the district court's grant of summary judgment for defendants First American Title Insurance Company, its issuing agent First American Title Insurance Company of Crook County (collectively, First American), and BHJ, Inc., a real estate brokerage, on their claims of breach of contract, bad faith, fraud, and negligent misrepresentation. This case presents the novel issue whether the issuance of a title commitment and subsequently issued title insurance policy give rise in Wyoming to a tort cause of action against the title insurer and/or its issuing agent separate and apart from the contractual obligations of the title policy. It also requires us to address the scope of the duty owed by a licensed real estate broker to non-client purchasers. We affirm the district court's grant of summary judgment as applied to defendant First American, but vacate and remand for further determination as to the real estate brokerage, BHJ, Inc.

[¶ 3] In case number 99–265, the defendants cross-appeal the district court's holding that a private road providing access to the

Hulses' property had been properly vacated by a recorded, written agreement of the previous landowners. We reverse the district court's holding.

## ISSUES

**99–256**

[¶ 4] Plaintiffs/appellants Hulses present this statement of the issues:

1. Whether a genuine issue of material fact exists precluding summary judgment on Hulses' claims of breach of contract, bad faith, fraud and negligent misrepresentation against First American Title Company of Crook County, f/k/a First American Title Guaranty Agency of Crook County, First American Title Insurance Company.

2. Whether a cause of action exists for negligent search and disclosure.

3. Whether a genuine issue of material fact exists on Hulses' claim of fraud and negligent misrepresentation against BHJ, Inc.

4. Whether a genuine issue of material fact exists precluding summary judgment concerning the causation of any of Hulses' damages.

Defendant/appellee First American restates the issues:

1. Was the District Court correct in its findings that the alleged actions of First American resulted in no damages to the Hulses or in the alternative that any damages were caused by the actions of the Hulses themselves?

2. Was the District Court correct in ruling as a matter of law that no cause of action exists in Wyoming for negligent search and disclosure by a title insurance agent?

3. Was the District Court correct in its finding that no genuine issue of material fact existed with respect to the Hulses' claims for fraud and negligent misrepresentation against First American and therefore First American was entitled to judgment as a matter of law?

Defendant/appellee BHJ, Inc. states the issues:

A. Did the trial court properly rule that plaintiffs cannot recover for fraud or misrepresentation when they cannot prove any reliance on any representations by BHJ, Inc. about the subject property and cannot demonstrate loss or damage as a result of any misrepresentation?

B. Did the district court err in its finding that as a matter of law, affected parties could vacate a private road established [sic] the Board of County Commissioners without County Commissioner approval?

*99–265*

Defendant/appellant First American presents this statement of the issues:

A. Did the trial court err in its finding that as a matter of law affected parties could vacate a private road established by the Board of County Commissioners?

B. Did the district court err in its finding that as a matter of law affected parties could vacate a private road established by the Board of County Commissioners without County Commissioner approval?

Plaintiffs/appellees Hulses accept appellant's statement of the issues.

### FACTS

[¶ 5] Pursuant to our standard of review for summary judgments, the recitation of facts is from the vantage point most favorable to the plaintiffs, as the party opposing the motions, awarding them all favorable inferences that may be drawn from the facts. *S & G Investors, LLC v. Blackley,* 994 P.2d 941, 943 (Wyo.2000).

[¶ 6] The case before us arises out of the 1994 purchase of a 2,080–acre ranch in Crook County, Wyoming known as the "Tumbling T" by plaintiffs Raymond and Kristina Hulse from William Moore. Access to this property is the focus of the parties' dispute; therefore, a discussion of its history is appropriate.

[¶ 7] In 1988, William and Phyllis Russell, Moore's stepfather and mother, owned the Tumbling T. At the time the property did not have access to a public highway so the Russells petitioned the Crook County Commissioners to declare a private road across the property of their neighbors, Albert and Lorene Neiman. In December of 1988, pursuant to Wyo. Stat. Ann. § 24–9–101 (Lexis 1999), the Crook County Commissioners granted the private road to the Russells on an already existing road that traversed the Neimans' property (hereinafter referred to as the Russell Private Road). Mr. Neiman objected to this grant because the private road was located on the east side of Whitetail Creek in an area where he kept a herd of buffalo.. He contended that fencing of the private road was required and would effectively prohibit him from using Whitetail Creek to water his livestock. Mr. Neiman then appealed the Commissioners' grant of the private road to the district court, which affirmed the Board's decision to establish the road but reversed its order on the measure of damages.

[¶ 8] Following these developments, Mr. Neiman proposed to the Russells that he establish another road on his property on the west side of Whitetail Creek which would give them access to the Tumbling T. On November 21, 1989, the Neimans signed and filed with the clerk of record a private easement and right of way granting the Russells a restricted easement across their property limited solely to "farming and ranching purposes" (hereinafter referred to as the Neiman restricted easement). In November of 1990, while awaiting the district court's decision on appeal of the measure of damages for the private road, the Neimans and Moore (now in possession of the Tumbling T) signed a "settlement agreement." The agreement provided that Moore would take the necessary steps to withdraw his request for the private road previously established by the county commissioners in exchange for which the Neimans would agree to dismiss their appeal and to consent to the establishment of a road across to "the school section" as a continuance of the easement previously granted by them. The parties agreed to execute the necessary documents to carry out the intent of their agreement.[1] On June

---

1. This document was not filed for record at the    Crook County Clerk's office until February 10,

4, 1991, Moore and the Neimans signed an "Agreement to Vacate Private Road" which purported to vacate the previously established private road and consider the Commissioners' order null and void. This document was filed with the clerk of record on September 9, 1991.

[¶ 9] We now turn to the facts surrounding the Hulses' purchase of the Tumbling T ranch. Ray Hulse and Bill Moore became acquainted when Hulse visited Wyoming to hunt. On these occasions Hulse often expressed an interest in purchasing the ranch from Moore. In a telephone conversation with Moore in 1994, Hulse learned that Moore had listed the property with BHJ, Inc., a real estate agency in Sheridan. Edward "Amory" Hubbard was the listing agent, and the ranch was priced at $975,000. Hulse continued to reside in Pennsylvania before the purchase and communicated with the parties in Wyoming generally by phone or fax with occasional visits. Hulse testified in deposition that at all times he intended to purchase the ranch for the purpose of operating a commercial hunting and outfitting business, bed and breakfast, and sporting goods shop. He further testified that he and/or Moore, more than once prior to and after signing a purchase agreement for the Tumbling T on May 24, 1994, had informed real estate agent Hubbard of Hulse's intended purpose for the ranch. In May of 1994, Moore assisted Hulse in his effort to obtain an outfitter's license by sending a letter of recommendation to the Wyoming State Board of Outfitters and Professional Guides.

[¶ 10] On May 24, 1994, Hulse signed a purchase agreement contracting to purchase the Tumbling T for $800,000. This agreement was written and provided by BHJ, Inc. and contained a standard disclaimer stating that the "Purchaser is not relying upon any representations of the Seller or Seller's agents or sub-agents as to any condition which Purchaser deems to be material to Purchaser's decision to purchase this property."

[¶ 11] The contract further provided in the section entitled "C. Objection Resolution:"

If written objections to defects of the property, signed by purchaser, are delivered to Broker within such period and if Seller and Purchaser have not executed a written agreement which satisfies and resolves such objection(s) on or before the 5th day of *August, 1994* this contract shall be void and the earnest money deposit shall be returned to Purchaser.

D. Other than written objections raised by Purchaser as set out above, or in the event no inspections are required by Purchaser, Purchaser acknowledges that he has not been denied any opportunity to inspect property and has done so to his satisfaction. Purchaser accepts the property in its entirety in "as is, where is" condition without any implied or express warranty by Seller or Agent.

Also on May 24, 1994, Hulse signed a Real Estate Brokerage Disclosure Statement that stated Mr. Hubbard was acting as the seller's agent.

[¶ 12] Hulse sought to finance the purchase of the ranch from a bank in Gillette, Wyoming. In a letter dated May 18, 1994, he informed the president of the bank of his intent to use the property as a guest ranch and commercial hunting operation. In June, the bank president telephoned Mr. Hubbard, the seller's agent, and notified him of a potential access problem with the property that must be resolved before the bank would issue the loan. Hubbard's handwritten note of June 6, 1994, states: "First Interstate Bank will not issue loan without unconditional easements through neighbors, *i.e.*, all-purpose for guests, hunters and ag." Mr. Hubbard began to investigate the access issues and discovered that there had been long standing problems about the roadways into the ranch. He then contacted Marie Jackson, an employee of defendant First American Title Insurance, and asked her to provide him with documentation regarding access to the Tumbling T. Hubbard testified in deposition that Marie Jackson told him that there were some definite problems which would have to be resolved before she could issue a clear title.

1997.

[¶ 13] After being supplied a copy of all the recorded documents, including the grant of restricted easement and Agreement to Vacate the Private Road, Hubbard sought the advice of an attorney regarding the property's access issues. The attorney prepared a document to be signed by the Neimans and Moore entitled "Amendment to Agreement to Vacate Private Road." The amendment clarified that the original Agreement to Vacate signed by the parties in 1991 was meant to vacate only that portion of the private road that crossed the Neiman property. On July 13, 1994, the Hulses were with Moore at a local bar when Hubbard sought to get Moore's signature on the Amendment. This was the first time the Hulses had met Hubbard in person. The agent, in the Hulses' presence, spoke generally and briefly about the document "taking care of the right of way problem." According to Hubbard, the document was not shown to the Hulses. The Hulses testified in deposition that they understood the purpose of having the parties sign the document was to "sign off" on the vacated road, so that they would be able to use the new road to access the property. The new road with the restricted easement was the one habitually used by Moore and the Hulses to access the Tumbling T. Neither at this meeting nor at any other time before closing were the Hulses informed that the new road was restricted to non-commercial use. Nor were the Hulses given copies of the documentation Hubbard provided to his attorney.

[¶ 14] Following the signing of the document, Hubbard's attorney sent a letter dated July 19, 1994, to the bank president. In the letter he states: "I believe we now have the necessary documents in place which make it clear that access exists across Neiman and Paradis properties. I have been working with Marie Jackson of First American Title Company, and she has informed me that she will issue a title commitment which does not contain an exception for access. In my opinion there is legally enforceable access to the Tumbling T ranch across both the Neiman and Paradis properties."

[¶ 15] On July 19, 1994, First American Title Insurance Company issued a title insur-ance commitment No. 18–9334 naming the Hulses as proposed insureds. The restriction on the Neiman easement was not listed on the commitment, nor was it ultimately listed as an exception on the issued title insurance policy No. 18–03038–0 which insured the Hulses against "lack of a right of access to and from the land." Hulse testified in deposition that after eventually learning of the restriction he asked Marie Jackson why it was not listed on the title insurance commitment or policy. According to Hulse, she told him that Amory Hubbard said, because the Amended Agreement had been signed by Moore and Neiman, the access issue had been resolved; therefore, the exception did not have to be listed, so she should omit it. Both Marie Jackson and Amory Hubbard deny this fact. Marie Jackson testified in deposition that she did not know of the restriction until after she had issued the policy.

[¶ 16] Closing on the property took place on August 9, 1994. Present were the Hulses, Moore, Hubbard, another employee of BHJ, Inc., and First Interstate Bank's president. Hulse testified that he passed out brochures for his new outfitting guest ranch business. At some point, the bank officer asked Hubbard if all the access problems had been settled. Hubbard replied stating that [the attorney he consulted] had taken care of it. Mr. Hulse testified in deposition, and no party disputes, that this was the first time Hulse had heard the attorney's name mentioned. He then asked, who is [the attorney]. According to Hulse, the bank president then told him that [the attorney] was the bank's attorney and he just checked the documents. Hulse then pointedly asked Hubbard and the president, "is there anything that—on this switching [the access or abandoning the right of way] that would stop us from running our business?" Hulse was assured that everything was taken care of.

[¶ 17] In April of 1995, Ray Hulse applied to the Wyoming Board of Outfitters for a hunting permit on "the school section," which was accessed across the Neiman property. He received a copy of a letter authored by Mr. Neiman to the Board dated June 8, 1995, objecting to the issuance of the permit. The letter stated that the only vehicle access to

the section was across Neiman's deeded land and Hulse had only a 30″ easement across the Neiman property which was solely limited to farming and ranching operations conducted on Hulse's own described property. In the letter, Neiman vigorously objected to pedestrians and hunters crossing land where he kept his buffalo herd.

[¶ 18] The Hulses contacted all the parties and asked for an explanation as to why they were not informed before closing about the restricted easement. They also expressed great concern that their commercial business was violating the easement. Hulse was unsure whether to continue to spend funds improving the Neiman restricted easement road. In a letter to Moore, Hulse stated that he would escrow his mortgage payments on the second mortgage held by Moore until the dispute was resolved and he was given unrestricted access across the easement. The Hulses voluntarily stopped making mortgage payments to Moore. The Hulses continued to pay their first mortgage to First Interstate Bank.

[¶ 19] On August 18, 1995, the attorney originally consulted by Hubbard wrote a letter to First Interstate Bank's president on the issues raised by Hulse. He gave two opinions regarding the Hulses' access to the Tumbling T. He first opined that the restricted easement was not in fact restricted because it was for uses directly deriving from the dominant estate. His opinion was that such uses would "include hunting, etc." However, he believed that the right-of-way could not be used to access the school section because those uses would not be directly derived from the dominant estate. His second opinion was that the Russell Private Road established by the county commissioners had not been vacated and was still in existence. He also stated that "[t]he quality of the [private] road is certainly something that [the Hulses] are stuck with unless they want to improve it themselves." It is unclear

from the record whether Mr. Hulse was provided this correspondence prior to the onset of litigation.[2]

[¶ 20] In 1996, Moore began a foreclosure action against the Hulses. The parties entered into a settlement agreement in which the Hulses agreed to give up their causes of action for misrepresentation against Moore regarding the purchase of the Tumbling T, to pay Moore $40,000 and his attorney's fees, and to pay him $365,000 by March 1, 1997. In return, Moore would reduce the amount owed to him under the second mortgage he carried on the property and transfer its deed to the Hulses. Because of the extensive improvements the Hulses had made on the property, the Tumbling T appraised for $1,143,000—$600,000 higher than it had prior to their purchase. When the Hulses' allegedly promised financing from First Interstate Bank fell through days before payment was due, they failed to make full payment to Moore pursuant to the settlement agreement and were ejected from the property.[3]

[¶ 21] On June 10, 1997, the Crook County Attorney responded to an inquiry by the Hulses' attorney asking whether the Russell Private Road had been vacated. The county attorney explained that the private road had never been vacated by official action. He stated that "[t]he Board of County Commissioners of Crook County asked me to do so in 1991. I set up a procedure and a Notice of Hearing was sent out to the parties. The Board decided on August 7, 1991 that the matter would be settled after all of the paperwork was completed ... but the Board has never formally vacated the road."

[¶ 22] In June of 1998, after forming a partnership with an investor, the Hulses repurchased the Tumbling T for $1,050,000. Through the sale they were given the title insurance policy issued to the sellers from First American Title Insurance Company. It listed the Neiman restricted easement as an exception to the policy and "the lack of a

---

2. This court makes no judgment as to these statements except to note that it would appear to be inconsistent for the attorney to draw up legal documents the very purpose of which, it appears, is to ensure a vacation of the Russell Private Road, and then later opine that the road has never been vacated.

3. This promise of financing to the Hulses from First Interstate Bank was the subject of a previous appeal before this court. *See Hulse v. First Interstate Bank of Commerce–Gillette,* 994 P.2d 957 (Wyo.2000).

right of access to and from the land which would result from the termination of said easements."

[¶ 23] At no time did Mr. Neiman ever physically restrict the Hulses from using the easement. However, Mr. Hulse signed an affidavit whereby he swore had he known that the road commonly used was restricted and that his legally enforceable access was the "unpassable" vacated private road, he would not have purchased the property. Currently, the Hulses access the Tumbling T through other surrounding properties they purchased and do not use the Neiman restricted easement.

[¶ 24] On August 10, 1998, the Hulses brought suit against the defendants First American Title Company alleging breach of contract, negligence, fraud, and bad faith. They allege defendant BHJ, Inc. is liable for negligent misrepresentation and committed fraud through misrepresentation and nondisclosure of the fact that the Neiman easement was restricted. The district court entered summary judgment for the defendants on all claims. This timely appeal and cross-appeal followed.

### STANDARD OF REVIEW

[¶ 25] Summary judgment is proper only when there are no genuine issues of material fact and the prevailing party is entitled to judgment as a matter of law. *Unicorn Drilling, Inc. v. Heart Mountain Irr. Dist.*, 3 P.3d 857, 860 (Wyo.2000); *Mountain Cement Co. v. Johnson*, 884 P.2d 30, 32 (Wyo.1994); W.R.C.P. 56(c). A material fact is any fact that, if proved, would have the effect of establishing or refuting an essential element of a claim or defense asserted by a party. *Century Ready–Mix Co. v. Campbell County Sch. Dist.*, 816 P.2d 795, 799 (Wyo.1991). We review a summary judgment in the same light as the district court, using the same materials and following the same standards. "We examine the record from the vantage point most favorable to the party opposing the motion, and we give that party the benefit of all favorable inferences which may fairly be drawn from the record." *Unicorn Drilling*, 3 P.3d at 860 (quoting *Four Nines Gold, Inc. v. 71 Constr.,*

*Inc.*, 809 P.2d 236, 238 (Wyo.1991)). Summary judgment serves the purpose of eliminating formal trials where only questions of law are involved. *Blagrove v. JB Mechanical, Inc.*, 934 P.2d 1273, 1275 (Wyo.1997); *England v. Simmons*, 728 P.2d 1137, 1141 (Wyo.1986). We review a grant of summary judgment by deciding a question of law de novo and afford no deference to the district court's ruling on that question. *Gray v. Norwest Bank Wyoming, N.A.*, 984 P.2d 1088, 1091 (Wyo.1999); *Blagrove*, 934 P.2d at 1275; *Sammons v. American Auto. Ass'n*, 912 P.2d 1103, 1105 (Wyo.1996).

### DISCUSSION

*99–265*

[¶ 26] The district court granted summary judgment to the defendants, reasoning that because nothing in Wyoming's private road statutes indicates that an act of the county commissioners is required to vacate a private road and because Moore, the owner of the private road interest, clearly indicated an intent to abandon the private road, then Moore's abandonment was effective. Defendants First American and BHJ, Inc. appeal this conclusion and argue that official action by the board of county commissioners must be taken before a private road is vacated. We agree that private parties cannot unilaterally vacate private roads established pursuant to Wyo. Stat. Ann. § 24–9–101 *et seq.* and hold that official action by the board of county commissioners that granted a private road is necessary to vacate it.

[¶ 27] The version of Wyo. Stat. Ann. §§ 24–9–101 and –103 in effect when the private road in question was established provided in pertinent part:

Any person whose land has no outlet to, nor connection with a public road, may apply in writing to the board of county commissioners of his county for a private road leading from his premises to some convenient public road.... Upon the hearing of the application, whether the owner or others interested appear or not, if the board finds that the applicant has complied with the law and that the private road is necessary, the board shall appoint

three (3) disinterested freeholders and electors of the county, as viewers and appraisers, and shall cause an order to be issued directing them to meet on a day named in the order on the proposed road, and view and locate a private road according to the application therefor, and to assess damages to be sustained thereby....

Wyo. Stat. Ann. § 24–9–101 (Lexis 1999), and

The viewers and appraisers so appointed ... shall make a report to the county commissioners ... and if the commissioners are satisfied that such report is just, and after payment by the applicant of all costs of locating such road, and the damages assessed by the viewers, the commissioners shall order such report to be confirmed and declare such road to be a private road, and the same shall be recorded as such.

Wyo. Stat. Ann. § 24–9–103 (Lexis 1999).

[¶ 28] Clearly, the statutes are silent as to the method or procedure required to vacate or abandon a private road.[4] However, we believe the same public interest and purpose that supplies the constitutional foundation for the creation of a private road by the board of county commissioners, as well as general principles of administrative law, necessitate procedural protections afforded by requiring official action to vacate a private road previously granted by official action.

■ [¶ 29] This court has long declared that Wyo. Stat. Ann. § 24–9–101 *et seq.* is rooted in the concept of a private way of necessity as stated in the eminent domain provision of the Wyoming Constitution, art. 1, § 32, which provides: "Private property shall not be taken for private use unless by the consent of the owner, except for private ways of necessity ... nor in any case without due compensation." *See Martens v. Johnson County Bd. of Comm'rs,* 954 P.2d 375, 379 (Wyo.1998); *Reaves v. Riley,* 782 P.2d 1136, 1137 (Wyo.1989); *Snell v. Ruppert,* 541 P.2d 1042, 1045–46 (Wyo.1975); *Meyer v. Colorado Cent. Coal Co.,* 39 Wyo. 355, 271 P. 212 (Wyo.1928). Eminent domain is the State's

right and power to appropriate private property to promote the general welfare. "Section 32, Art. 1, Wyoming Constitution is a recognition of the proposition that the uses there outlined while serving a private purpose indirectly benefit the general public. A private use is by constitutional edict given the force and effect of a public use." *Coronado Oil Co. v. Grieves,* 603 P.2d 406, 410 (Wyo.1979) (citing *Grover Irrigation & Land Co. v. Lovella Ditch, Reservoir & Irrigation Co.,* 21 Wyo. 204, 131 P. 43 (1913)).

[¶ 30] In *Snell v. Ruppert,* this court discussed the development of the use of eminent domain to establish a private road leading from the land of an individual to the nearest highway when he has no means of ingress and egress in any other manner. We accepted the premise that "[t]here is a public interest in giving access by individuals to the road and highway network of the state as a part and an extension thereof for economic reasons and the development of land as a resource for the common good, whether residential or otherwise." *Id.* 541 P.2d at 1046 fn. 5 (citing 2A Nichols, *The Law of Eminent Domain,* (Rev. 3rd ed.) § 7.626). *See also* Jon W. Bruce and James W. Ely Jr., *The Law of Easements and Licenses in Land,* (Rev. ed.1995) § 4.02[4].

■ [¶ 31] Wyoming's private road statutes provide the mechanism by which a landowner may petition the exercise of the State's eminent domain power to condemn a private road across another's property in order to establish access between his own property and a public road. It is important to note the Wyoming Legislature, through its adoption of Wyo. Stat. Ann. § 24–9–101 *et seq.,* vested the State's eminent domain power, not in the landlocked landowner, but in the board of county commissioners.

[¶ 32] In *Bush v. Duff,* we reversed what was in essence the grant of a private road by a district court as a violation of the separation of powers and reiterated, "the statute ... grants the power and authority to establish a private road to the county commissioners in the respective counties. Those pro-

---

4. The Wyoming Legislature extensively rewrote the private road act in 2000; however, the revised statutes do not provide for the manner in which a private road is vacated. *See* 2000 Wyo. Sess. Laws ch. 88, § 1.

ceedings are administrative in nature and a function of the executive department of government." *Bush v. Duff,* 754 P.2d 159, 165 (Wyo.1988) (footnote omitted) (overruled on other grounds, *Ferguson Ranch, Inc. v. Murray,* 811 P.2d 287 (Wyo.1991)). We have long held that the board's entry of order granting or denying the creation of a private road is final agency action, appeals from which are governed by Wyoming's Administrative Procedures Act.[5] Consequently, review by the district court is limited primarily to ensuring the board adhered to the governing statute and that its factual conclusions are supported by substantial evidence. *McGuire v. McGuire,* 608 P.2d 1278, 1285 (Wyo.1980); *Miller v. Bradley,* 4 P.3d 882, 886 (Wyo.2000). Accordingly, just as we decline to recognize the power of individual parties to nullify agency orders by private agreement in other arenas of administrative law, we likewise decline to do so merely because the agency order establishes a private road across an individual landowner's private property.

[¶ 33] Moreover, this court has held the right to condemn a way of necessity under constitutional and statutory provisions is an expression of public policy against landlocking property and rendering it useless. *See Coronado Oil,* 603 P.2d at 410 (citing *Franks v. Tyler,* 531 P.2d 1067 (Okla.App. 1974)). As a consequence, the statute provides that any grant of a private road under its provisions requires a finding by the board that the property owner seeking its creation has no legally enforceable access to a public road and that the private road is "necessary" before it may enter its order declaring the creation of the private road. Wyo. Stat. Ann. §§ 24-9-101, -103. Therefore, we think the public policy against landlocking property that justifies exercise of the State's eminent domain power as given legislative effect within the private road statutes implicitly requires a contrary finding by the board of county commissioners before an established private road may be vacated.

[¶ 34] In so holding, we recognize that the public's interest in promoting the productive use of land furthered by giving individuals access to the road and highway network of the state justifies the official declaration of a private road and its official vacation; however, we remain conscious of the fact that the property interest in the road created by the board of county commissioners at all times is a *private* interest. *See Nixon v. Edwards,* 72 Wyo. 274, 292–93, 264 P.2d 287, 294 (Wyo.1953). Moreover, this court is cognizant that the board of county commissioners has only those powers provided by statute. *Dunning v. Ankney,* 936 P.2d 61, 64–65 (Wyo.1997); *McGuire v. McGuire,* 608 P.2d at 1287.

[¶ 35] Accordingly, we expressly hold that a board of county commissioners' duties in vacating established private roads are principally ministerial. The Board shall enter the order vacating a private road and cause such vacation to be entered in the public record upon the fulfillment of the following requirements. First, the owner of the previously landlocked property, lack of access to which necessitated the creation of the private road, and any landowner over whose property the private road passes must agree in writing to the vacation. Second, the board must find that the affected property will continue to maintain alternate, legally enforceable, unrestricted access to a public road, such that the vacation will not cause landlocking of the property. We are confidant the procedural safeguards put in place by this holding strike an appropriate balance between the public's interest in efficient use of the state's constitutional power of eminent domain and an individual landowner's interests in the unfettered use and enjoyment of his/her private property.[6]

*99–256*

### Claims against defendants First American

[¶ 36] The Hulses contend that defendants First American owed them a ·

---

5. Wyo. Stat. Ann. § 16-3-114 (LexisNexis 2001).

6. Because the private road statute is silent as to the method by which such roads are vacated, should the Wyoming Legislature prefer another construction their will may be expressed by statutory amendment.

duty, as the insureds under defendants' issued title policy, to search and disclose any reasonably discoverable defects and encumbrances of title. They further contend this duty was breached when First American failed to list the recorded Neiman restricted easement on the commitment or policy and that this nondisclosure caused them substantial damages. "Essential to any negligence cause of action is proof of facts which impose a duty upon defendant. The question of the existence of a duty is a matter of law for the court to decide." *Hamilton v. Natrona County Education Ass'n*, 901 P.2d 381, 384 (Wyo.1995) (quoting *Goodrich v. Seamands*, 870 P.2d 1061, 1064 (Wyo.1994)). A duty may arise by contract, statute, common law, or when the relationship of the parties is such that the law imposes an obligation on the defendant to act reasonably for the protection of the plaintiff. *Hamilton*, 901 P.2d at 384; *Goodrich*, 870 P.2d at 1064; *Caterpillar Tractor Co. v. Donahue*, 674 P.2d 1276, 1280 (Wyo.1983).

[¶ 37] The Hulses first argue that the defendants' duty to search and disclose is implied by the contract itself, either from First American's issuance of its preliminary commitment or its listing of some defects in the title as implying to the insured that a search was made to uncover those defects. We disagree. This court has often stated when interpreting an insurance contract, we follow general tenets of contract construction. *Ahrenholtz v. Time Ins. Co.*, 968 P.2d 946, 949 (Wyo.1998); *Squillace v. Wyo. State Employees' and Officials' Group Ins. Bd.*, 933 P.2d 488, 491 (Wyo.1997). We delineated our rules of insurance contract construction in *St. Paul Fire & Marine Ins. Co. v. Albany County Sch. Dist. No. 1*, 763 P.2d 1255, 1258 (Wyo.1988) (citations omitted):

The interpretation of a written contract is done by the court as a matter of law. An exception to construing insurance policies as other contracts has been observed by this Court where the language of the policy is ambiguous, in which case the policy must be strictly construed against the insurer. Ambiguity, however, is not generated by a subsequent disagreement between the parties as to the meaning of the policy. Further, the language of an insurance policy will not be "tortured" in order to create an ambiguity.

If the policy language is clear and unambiguous, the rule of strict construction against the insurer does not apply, and the policy must be interpreted in accordance with the ordinary and usual meaning of its terms. The parties to an insurance contract are free to incorporate within the policy whatever lawful terms they desire, and the courts are not at liberty, under the guise of judicial construction, to rewrite the policy.

[¶ 38] We have carefully read both the Commitment and the Policy issued by the defendant First American and cannot find any language expressing an intent to impose a duty to search the records for benefit of the insured, nor any language from which such a duty may be implied. The information page attached to the Commitment expressly stated: "the Title Insurance Commitment is a legal contract between you and the Company. It is issued to show the basis on which we will issue a Title Insurance Policy to you. The Policy will insure you against certain risks to the land title, subject to the limitations shown in the Policy."

[¶ 39] Plaintiffs point to the decisions of other courts holding that title insurance policies must be construed so as to give the insured the protection which they reasonably had a right to expect, thus implying a duty to search the record and disclose its findings to the insured. However, this court has declined to apply the "reasonable expectations" theory of recovery in insurance contract cases in the face of clear and unambiguous policy terms. *See Ahrenholtz v. Time Ins. Co.*, 968 P.2d 946, 949–50 (Wyo.1998); *Pribble v. State Farm Mutual Auto. Ins. Co.*, 933 P.2d 1108, 1113–14 (Wyo.1997). In the instant case, we find nothing in the language of the contracts between the parties which gives rise to even an ambiguity as to the defendants' obligation to search the record for the benefit of the insured; therefore, the doctrine of reasonable expectations is inapplicable. Defendant First American clearly had no duty, express or implied, under the Commitment or the Policy to search the records,

and any search it may have actually undertaken was undertaken solely for its own protection as indemnitor against losses covered by its policy. Therefore, we hold that First American breached no contractual duty to the Hulses by failing to list the recorded Neiman restricted easement on either the Commitment or Title Insurance Policy issued to them.

[¶ 40] The plaintiffs alternatively urge this court to recognize that the defendant American Title Insurance Company had a duty arising in tort to make a reasonable search of the record and disclose any defects and encumbrances of title to them as the insureds. Whether a title insurer may be liable in tort for negligently failing to discover and disclose defects in title has been the subject of debate in many courts and commentary but is an issue of first impression before this court. Courts in other jurisdictions are split on the question. Some have concluded that a title company should be liable in tort if it negligently fails to discover and disclose a defect. *See e.g., Title Ins. Co. of Minnesota v. Costain Arizona, Inc.,* 164 Ariz. 203, 791 P.2d 1086, 1090 (App.1990); *Shada v. Title & Trust Co. of Florida,* 457 So.2d 553, 557 (Fla.App.1984); *Ford v. Guarantee Abstract & Title Co., Inc.,* 220 Kan. 244, 553 P.2d 254, 266 (1976); *Heyd v. Chicago Title Ins. Co.,* 218 Neb. 296, 354 N.W.2d 154, 158 (1984). *See generally,* Joyce Dickey Palomar, *Title Insurance Companies' Liability for Failure to Search Title and Disclose Record Title,* 20 Creighton L.Rev. 455 (1987). The theory is that once the title insurer takes on the responsibility of doing some type of title search and disclosing some defects, the company has a duty to one it knows may rely on those services to search and disclose fully and accurately. *See* Jay M. Zitter, Annotation, *Title Insurer's Negligent Failure to Discover and Disclose Defect as Basis for Liability in Tort,* 19 A.L.R.5th 786 (1994).

[¶ 41] In contrast, other courts have refused to impose tort liability on title insurance companies. *See e.g,. Brown's Tie*

*& Lumber Co. v. Chicago Title Co. of Idaho,* 115 Idaho 56, 764 P.2d 423, 427 (1988); *Horn v. Lawyers Title Ins. Corp.,* 89 N.M. 709, 557 P.2d 206, 208 (1976); *Stewart Title Guaranty Co. v. Cheatham,* 764 S.W.2d 315, 319 (Tex. App.1988); *Greenberg v. Stewart Title Guaranty Co.,* 171 Wis.2d 485, 492 N.W.2d 147, 152 (1992). These courts reason that because a title insurer does not purport to act as anything other than an insurance company, no tort liability exists unless the insurer has voluntarily assumed a duty of searching title for the insured's benefit in addition to the contract to insure title. They further conclude that the issuance of a preliminary report or title commitment is not an independent assumption of a duty to search and disclose reasonably discoverable defects. We find this reasoning persuasive especially in light of our own state statutes on the subject of title insurance.

[¶ 42] Wyo. Stat. Ann. § 26–23–303(a)(xvii) (LexisNexis 2001) defines a "commitment" as synonymous with the term "report." If issued prior to the issuance of a policy, the commitment "constitutes a statement of the terms and conditions upon which the insurer is willing to issue its policy but is not a title policy. Neither a title policy nor a report issued prior to the issuance of a title insurance policy is an abstract of title." Some courts have recognized a title insurer's tort liability on the basis that the issuance of a preliminary commitment occurs weeks prior to the actual issuance of the insurance policy. In doing so, they have equated the commitment to an abstract of title and thus the title insurance company's duty of care to that of an abstractor. *See e.g., First American Title Ins. Co., Inc. v. First Title Serv. Co. of the Florida Keys, Inc.,* 457 So.2d 467, 472–74 (Fla.1984); *Heyd,* 354 N.W.2d at 158. Wyoming statute clearly prevents this court from making that analogy. We cannot premise a title insurer's tort liability on the mere fact of issuance of a title insurance commitment.[7]

---

7. This is not to imply that Wyoming's Title Insurance Act fails to contemplate that title insurers will act as abstractors of title. The Act is replete with provisions relating to insurers searching records and abstracting title. However Wyoming statutes expressly indicate that an insurer is not acting as an abstractor when issuing a title "commitment."

[¶ 43] Moreover, we think the better analysis in determining whether to establish a title insurer's tort duty for reasonable search and disclosure recognizes that the relationship between the insured and the title insurance company is essentially contractual. Accordingly, we hereby adopt the reasoning of the New Jersey Supreme Court in *Walker Rogge, Inc. v. Chelsea Title & Guaranty Co.,* 116 N.J. 517, 562 A.2d 208, 220 (1989):

> Although we recognize that an insured expects that a title company will conduct a reasonable title examination, the relationship between the company and the insured is essentially contractual. The end result of the relationship between the title company and the insured is the issuance of the policy. To this extent, the relationship differs from other relationships conceivably sounding in both tort and contract, such as the relationship between physician and patient.... By contrast, the title company is providing not services, but a policy of insurance. That policy appropriately limits the rights and duties of the parties.

> From this perspective, the insured expects that in consideration for payment of the premium, it will receive a policy of insurance. The insurer's expectation is that in exchange for that premium it will insure against certain risks subject to the terms of the policy. If the title company fails to conduct a reasonable title examination or, having conducted such an examination, fails to disclose the results to the insured, then it runs the risk of liability under the policy. In many, if not most, cases conduct that would constitute the failure to make a reasonable title search would also result in a breach of the terms of the policy.

[¶ 44] This analysis is supported by Wyo. Stat. Ann. § 26–23–303(a)(xxi) which defines a title insurance policy as:

> [A] contract wherein, subject to the stated terms and conditions, a title insurer insures, guarantees or indemnifies owners of real or personal property or the holders of liens or encumbrances thereon or others interested therein against loss or damage suffered by reason of:

> (A) Defects in, adverse claims, liens or encumbrances in the title to the stated property;

> (B) Unmarketability of the title to the stated property;

> (C) Guaranteeing, warranting or otherwise insuring by a title insurance company the correctness of searches relating to the title to property;

> (D) Defects in the authorization, execution or delivery of an encumbrance upon such property;

> (E) The insuring by a title insurance company the validity and enforceability of evidences of indebtedness secured by an encumbrance upon the title or interest in such property;

> (F) The invalidity, unenforceability or loss of priority of an insured mortgage resulting from a change in rate of interest or principal balance, or both, which change is in accordance with the provisions of the insured mortgage.

[¶ 45] Clearly, according to the plain language of Wyoming statute, the duty owed to an insured that arises through the issuance of a title insurance policy is contractual and subject to the policy's stated terms and conditions. Subsection (C) demonstrates that a title insurance policy *may* guarantee by a title insurance company the correctness of searches relating to the property, however, as in general, this particular guarantee is subject to the terms and conditions of the policy. In *Snyder v. Lovercheck,* we declined to recognize the tort of negligent misrepresentation against a seller arising from a contract between sellers and purchasers of real estate. We cited with approval *Ford Motor Credit Co. v. Suburban Ford,* 237 Kan. 195, 699 P.2d 992, 998 (1985) *cert. denied,* 474 U.S. 995, 106 S.Ct. 409, 88 L.Ed.2d 360 (1985), for the proposition that, "a contract action cannot become a tort action by simply saying so ... when parties' difficulties arise directly from a contractual relationship, the resulting litigation concerning those difficulties is one in contract no matter what words the plaintiff may wish to use in describing it." *Snyder v. Lovercheck,* 992 P.2d 1079, 1088 (Wyo.1999).

[¶ 46] Finally, some courts have recognized a title insurer's duty in tort to undertake a reasonable search and disclosure for the benefit of the insured. These cases are premised in part upon state underwriting standards statutes which provide generally that no title insurance policy may be written unless and until the title insurance company has caused to be conducted a *reasonable examination* of the title. *Ruiz v. Garcia*, 115 N.M. 269, 850 P.2d 972, 975 (1993); *Cottonwood Enterprises v. McAlpin*, 111 N.M. 793, 810 P.2d 812, 815 (1991). However, Wyoming's underwriting standard statute § 26–23–308(a) (LexisNexis 2001) merely provides that "[n]o title insurance policy as to property in this state shall be written unless it is based upon **adequate evidence** of the current condition of title certified in writing as of the date of the policy...." (Emphasis added.) Even were we somehow to find that this statutory language imposed a duty on insurers to reasonably search the public record and disclose their findings, Wyoming Statute § 26–23–334(b) (LexisNexis 2001) precludes us from creating a private cause of action on this basis when it expressly states, "[t]his article is enforceable only by the commissioner and shall not create any private cause of action or other private legal recourse."

[¶ 47] In conclusion, should the Wyoming Legislature choose to recognize a public policy behind requiring title insurance companies to conduct title searches with reasonable care and disclose those results to their insured, they may create that duty by statute. However, at this time, for the foregoing reasons, we decline to do so by judicial enactment.

[¶ 48] The Hulses next contend that First American committed fraud when its employee Marie Jackson deliberately removed the Neiman restricted easement from the title commitment and subsequently issued title policy. They further contend they were damaged when they relied on this information or, more accurately, lack of information. This contention amounts to a claim of fraudulent nondisclosure and fraudulent concealment. *Sundown, Inc. v. Pearson Real Estate Co., Inc.*, 8 P.3d 324, 331 (Wyo.2000); *Richey v. Patrick*, 904 P.2d 798, 801 (Wyo.

1995) (citing *Restatement (Second) Torts* § 551, 550 (1977)). We recently said in *Sundown*, "[b]efore nondisclosure or fraudulent concealment can be considered, [the plaintiff] must show that [the defendant] had a duty to disclose the information." *Id.* 8 P.3d at 331 (citing *Burman v. Richmond Homes Ltd.*, 821 P.2d 913, 918 (Colo.App.1991)). As we have previously discussed within this opinion, First American owed no duty to disclose the restricted easement to its insureds, the Hulses, thus they committed no fraud by failing to do so. Further, we note as a purely factual matter because the contract between the parties is one of indemnity, by choosing not to list the restricted easement as an exception to the policy, First American increased its own risk of coverage under the contract in insuring against a lack of access to and from the land. This action can hardly be deemed to have harmed the Hulses.

[¶ 49] The Hulses next contend that First American acted in bad faith by denying coverage under its policy for "lack of a right of access to and from the land" without a reasonable basis for doing so. This court adopted the tort of bad faith in regard to denial of claims by insurance companies in *McCullough v. Golden Rule Ins. Co.*, 789 P.2d 855 (Wyo.1990). There we said the appropriate test to determine bad faith is the objective standard that the validity of the denied claim was not "fairly debatable." *Id.* at 860. We explained that the "fairly debatable standard" is premised upon the logic that if a realistic question of liability does exist, the insurance carrier is entitled to reasonably pursue that debate without exposure to a claim of violation of its duty of good faith and fair dealing. *Id.* Following *McCullough*, we have reiterated our support for the "fairly debatable" standard, continuing to hold that "[t]he tort of bad faith can be alleged only if the facts pleaded would, on the basis of an objective standard, show the absence of a reasonable basis for denying the claim, *i.e.*, would a reasonable insurer under the circumstances have denied or delayed payment of the claim under the facts and circumstances." *Id.* (citing *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 376–77 (1978)); *Kirkwood v. CUNA Mutual Ins.*

*Society,* 937 P.2d 206, 211 (Wyo.1997); *Darlow v. Farmers Ins. Exch.,* 822 P.2d 820, 823 (Wyo.1991).

[¶ 50]   Under this standard, the district court was correct in granting summary judgment to the defendants First American. Even if viewing the facts in the light most favorable to the Hulses, we cannot but conclude that any reasonable insurer would have denied or delayed payment under the facts and circumstances before us.   Title Policy No. 18–03038–0 issued by defendants First American insured against loss or damage by reason of a "lack of a right of access to and from the land."   However, at no point in the Hulses' possession of the Tumbling T did they ever lack a right of access to and from the land.   As previously discussed, the Russell Private Road was never effectively vacated.   The Hulses maintained, and continue to maintain, legally enforceable unrestricted access across the Neiman property by way of this road.   While its physical condition may not be satisfactory to them, the policy does not insure the physical condition of the roadway, but rather whether it provides a legal right of access.   Only defects shown in the public record relating to a legal right of access are covered under the policy.[8]   *See Hocking v. Title Ins. & Trust Co., `37 Cal.2d 644, 234 P.2d 625 (1951); see generally,* Charles Plovanich, Annotation, *Defect in, or Condition of, Adjacent Land or Way as Within Coverage of Title Insurance Policy,* 8 A.L.R.4th 1246 § 4[c] (1981).   In summary, having determined there is no genuine issue as to any material fact on the plaintiffs' claims against defendants First American, we affirm the district court's grant of summary judgment in their favor.

### Claims against Defendant BHJ, Inc.

[¶ 51]   The Hulses appeal the district court's grant of summary judgment for the defendant BHJ, Inc., a licensed real estate brokerage, for the acts of its agent Amory Hubbard on claims they label negligent misrepresentation and fraud.   We take this opportunity to clarify the duties owed by licensed real estate brokers, agents, and salespersons and the causes of action that may arise as a result of an alleged breach of those duties.

[¶ 52]   The Hulses assert a claim of negligent misrepresentation against defendant BHJ, Inc. citing *Restatement (Second) Torts* § 552.   In *Richey v. Patrick,* a case involving claims by purchasers of real property against lay sellers, we discussed the tort of negligent misrepresentation as found in the *Restatement* and stated that in order for there to have been a negligent misrepresentation, the plaintiff must show that

> [o]ne who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Richey,* 904 P.2d 798, 802 (Wyo.1995).

[¶ 53]   In *Richey,* we found that the sellers had not "supplied false information," as required by the claim, because the sellers had not supplied *any* information to the purchasers.   We said, "[a] nondisclosure of information cannot support a claim of misrepresentation;  since nothing has been represented, an essential element of the claim is missing."   *Id.* at 802 (citing *Burman v. Richmond Homes, Ltd.,* 821 P.2d 913, 919 (Colo.App.1991)).   We went on to hold that the crux of the purchasers' complaint was that the sellers should have informed them of a material fact, they owed a duty to do so, and it was this nondisclosure that caused the plaintiff's damage.   In *Richey,* we then clarified that the appropriate claim was one for negligent nondisclosure as found within *Restatement (Second) Torts* § 551.   However, we declined to apply the *Restatement* section to the plaintiffs' claim because we reasoned that the "as is" clause contained within the purchase contract signed by the

---

8.   Thus, had we determined that the Neiman restricted easement provided the only access to the Tumbling T, because a restriction on use is a defect, and as this defect was well established in the public record, First American may have been liable under its policy.

sellers and purchasers placed the risk of discovery of adverse material facts upon purchasers of real estate. Thus, we recognized the relationship between the parties was essentially contractual and held that when a contract places the burden on the purchaser to discover defects, they are barred from seeking relief for negligent nondisclosure.

[¶ 54] Likewise, in our recent case of *Snyder v. Lovercheck*, we addressed as an issue of first impression whether a purchaser of realty could even bring a claim of negligent misrepresentation, a tort action, against a seller when the relationship between the parties arises in contract. Again, we held that the contractual relationship is controlling. When purchasers of realty sign contracts with disclaimers and merger clauses stating that the purchaser is not relying on the representations of the sellers or their agents as to the condition of the property, the contract has allocated the risks of loss resulting from the purchaser's reliance on the seller's representations to the purchaser. In reasoning to our ultimate conclusion, this court had an extended discussion of the distinction between duties arising by tort and those arising by contract. We said:

> Tort law proceeds from a long historical evolution of externally imposed duties and liabilities. Contract law proceeds from an even longer historical evolution of bargained-for duties and liabilities. The careless and unnecessary blanket confusion of tort and contract would undermine the carefully evolved utility of both.
>
> In tort, the legislatures and the courts have set the parameters of social policy and imposed them on individual members of society without their consent. The social policy in the field of contract has been left to the parties themselves to determine, with judicial and legislative intervention tolerated only in the most extreme cases. Where there has been intervention, it has been by the application of well established contract doctrines, most of which focus on threats to the integrity of the bargaining process itself such as fraud or extreme imbalance in bargaining power.

*Snyder v. Lovercheck*, 992 P.2d at 1087.

[¶ 55] As illustrated by our holdings in *Richey* and *Snyder*, this court continues to value the freedom to contract between sellers and purchasers of realty. We recognize that the parties to the contract may allocate the risks of loss as they so choose. Having done so, absent proof of fraud, we generally allow the unambiguous language found in the parties' contract to control the scope of subsequent litigation. We have been exceedingly reluctant to introduce tort principles into claims that are essentially contract actions.

[¶ 56] However, this court's jurisprudence reflects that the inverse rule is likewise valid. Contract principles that govern the parties to a contract are not controlling on claims against nonparty professionals whose duties arise in tort. Our precedent reveals a recognition that tort duties and liabilities imposed by the legislatures and courts are supported by underlying social policies which require the imposition of obligations on a defendant to act reasonably for the protection of a plaintiff. By imposing tort duties, courts and legislatures have externally allocated the risks arising from certain relationships for the protection of the public. Having done so, individual parties are limited in shifting those burdens from the obligor to the obligee by private action.

[¶ 57] At this point in time, there can be no doubt that licensed professional real estate agents and brokers are a class of persons on whom the law has imposed affirmative tort duties. Two decades ago this court stated in *Hagar v. Mobley:*

> Real estate brokers and salesmen are licensed by the State of Wyoming and required to meet high standards of honesty, integrity, trustworthiness and competency. Theirs is a regulated profession. Failure to satisfy those standards is ground for suspension or revocation of a real estate broker's or salesperson's license. An act licensing real estate agents must be construed in the light of an obvious purpose of protecting the public in the handling of important and valuable transactions relating to real property. *As a result, such an agent does not stand in*

*the same shoes of a lay vendor.* Such realtors owe the vendee the same duties of integrity owed the public at large. They must be honest, trustworthy and competent.

*Hagar v. Mobley,* 638 P.2d 127, 136 (Wyo. 1981) (emphasis added and citation omitted). In *Hagar,* we cited with approval the reasoning of the Utah Supreme Court reversing the dismissal of a claim against a realtor:

> In this state, it is apparent that the rule of caveat emptor does not apply to those dealing with a licensed real estate agent. Though not occupying a fiduciary relationship with prospective purchasers, a real estate agent hired by the vendor is expected to be honest, ethical, and competent and is answerable at law for breaches of his or her statutory duty to the public.

*Hagar,* 638 P.2d at 137 (quoting *Dugan v. Jones,* 615 P.2d 1239, 1248 (Utah 1980)).

[¶ 58] Furthermore, we cited with approval the Montana Supreme Court's then recent holding that real estate brokers have, like other professionals, certain standards of care which must be satisfied. We said that the Montana court observed that the failure to maintain those standards of skill, competency, and integrity exposes realtors to, in effect malpractice actions. *Hagar,* 638 P.2d at 137 (citing *McCarty v. Lincoln Green, Inc.,* 190 Mont. 306, 620 P.2d 1221, 1225 (1980)). This court went on to state that we may exact a high standard of care from realtors and held that the standard of care for realtors may be adopted by the court from a legislative enactment. *Id.* (citing *Distad v. Cubin,* 633 P.2d 167 (Wyo. 1981)). We reiterated:

> Realtors, just like doctors, lawyers, engineering consultants, and builders, hold themselves out as professionals; it is their job to know their profession. People rely on and trust them. Failure to comply with either the accepted standards in the field or the standards society is willing to recognize as acceptable, is actionable.

*Hagar,* 638 P.2d at 138. As to the question of damages, we held "[t]he liability of real estate agents, brokers and salespersons, as in all actions predicated upon the failure to perform some duty, sounds in tort. In tort cases damages are generally awarded in order to compensate claimants for loss. The measure of damages is the amount which will compensate for all the detriment proximately caused by the breach of duty." *Hagar,* at 139.

[¶ 59] Subsequent to our holding in *Hagar,* parties have apparently seized on the language within the opinion stating the duty of care as *"the broker is liable because of material representations of the principal if he repeats them and knows, or reasonably should know, of their falsity. Liability attaches in this context on grounds of negligence,"* *id.* at 137, and have asserted claims labeled "negligent misrepresentation" against both lay sellers and real estate brokers and agents. "Negligent misrepresentation" and "negligent nondisclosure" are generic tort actions found within the *Restatement (Second) Torts* §§ 552 and 551 respectively. These torts have specific elements and, as previously discussed, this court has addressed in various opinions whether to adopt and apply them to claims brought by plaintiffs against sellers of realty and real estate brokers and agents. *See Richey v. Patrick,* 904 P.2d 798 (Wyo.1995); *Snyder v. Lovercheck,* 992 P.2d 1079 (Wyo.1999); *Sundown, Inc. v. Pearson Real Estate Co., Inc.,* 8 P.3d 324 (Wyo.2000). We have also addressed the effect of various exculpatory clauses on the above causes of action. At this juncture, we reaffirm all prior holdings and precedent as applied to lay vendors/sellers of real property and their agents or subagents, who **are not** licensed real estate professionals.

[¶ 60] However, notwithstanding any subsequent confusion in formulating, titling, or deciding tort claims against licensed real estate professionals premised upon their duties imposed by statute, it is abundantly clear that *Hagar* contemplated that the claim was one of professional negligence. This is the holding that we expressly reaffirm by this decision. It is further supported by legislative enactments in 1997 by which the Wyoming Legislature essentially codified the court's holding in *Hagar* and went further to expand and clarify the duty of care owed by real estate professionals to parties when acting as seller's, buyer's or

intermediary agents. *See* Wyo. Stat. § 33–28–303 (LexisNexis 2001) *Seller's agent engaged by seller;* Wyo. Stat. § 33–28–304 (LexisNexis 2001) *Agent engaged by buyer;* Wyo. Stat. Ann. § 33–28–305 (LexisNexis 2001) *Intermediary.* The Wyoming Legislature in 2000 adopted Wyo. Stat. § 33–28–124 *Act, error or omission in the rendering of real estate services,* which provides: "A cause of action arising from an act, error or omission in the rendering of services provided by a licensee under this act shall be brought within the time limits provided under W.S. 1–3–107." Wyo. Stat. Ann. § 1–3–107 is the statute of limitations for claims of professional negligence. It is applicable to claims arising after the effective date of Wyo. Stat. Ann. § 33–28–124.[9]

[¶ 61] As we held in *Hagar,* the court may adopt from legislative enactment a standard of care for realtors. *Id.,* 638 P.2d at 137. Wyo. Stat. § 33–28–303(c) provides:

"A broker acting as a seller's agent owes no duty or obligation to the buyer, except that a broker shall disclose to any prospective buyer all adverse material facts actually known by the broker. The adverse material facts may include adverse material facts pertaining to the title and the physical condition of the property, any material defects in the property and any environmental hazards affecting the property which are required by law to be disclosed. The broker acting as a seller's agent shall not perpetuate a material misrepresentation of the seller which the broker knows or should know is false." [10]

In *Hagar* we said that the facts necessary to be disclosed are those that are "pivotal to the transaction from the buyer's perspective." *Id.* at 138 (quoting *Tennant v. Lawton,* 26 Wash.App. 701, 615 P.2d 1305, 1309–1310 (1980)).

[¶ 62] Having hereby outlined what law is applicable to the liability of real estate brokers and salespersons, we note that the claims asserted by the plaintiffs, while labeled "negligent misrepresentation," essentially assert a breach of the duty of care owed by real estate professionals to nonclient buyers. However, as a reviewing court, we are not fact finders in the first instance. The district court's grant of summary judgment did not address the issue of whether BHJ, Inc.'s agent, Hubbard, exercised such care, skill, and diligence as others who are engaged in the profession would ordinarily exercise under similar circumstances in fulfilling the duties imposed upon him by statute. We, therefore, vacate the district court's grant of summary judgment to BHJ, Inc. on the issue of "negligent misrepresentation" and remand for a determination under the applicable standard consistent with the law we have herein set out.

[¶ 63] The Hulses also appeal the district court's decision on their claims of fraud against BHJ, Inc. The district court held that the disclaimer section of the purchase sales agreement signed by the Hulses, which states they are not relying on any representations by the seller or the seller's agent about the property, acts as a bar to their claim. We recently held in *Snyder v. Lovercheck,* that such a disclaimer bars a claim for negligent misrepresentation; however, we held that buyers are not precluded, by either merger or disclaimer clauses, from asserting a claim for fraudulent misrepresentation if the misrepresentation occurred prior to execution of the contract. *Snyder v. Lovercheck,* 992 P.2d 1079, 1086 (Wyo.1999). The district court also premised its grant of summary judgment for defendant BHJ, Inc. on "undisputed facts show[ing] that access

9. When professional negligence is asserted, we generally require the plaintiff to present expert witness testimony which reveals the standard of care applicable to the profession and the defendant's compliance with or breach of that standard. *See e.g., Garaman, Inc. v. Williams,* 912 P.2d 1121, 1123 (Wyo.1996) (architect) *Moore v. Lubnau,* 855 P.2d 1245, 1248 (Wyo.1993) (attorneys); *Kemper Architects, P.C. v. McFall, Konkel & Kimball Consulting Engineers, Inc.,* 843 P.2d 1178, 1185 (Wyo.1992) (engineers); *Roybal v.*

*Bell,* 778 P.2d 108, 111 (Wyo.1989) (physicians). Because the aforementioned statutes establish the standard of care for real estate professionals with clarity, expert testimony as to that standard and its breach are unnecessary.

10. *See generally,* Diane M. Allen, Annotation, *Real–Estate Broker's Liability to Purchaser for Misrepresentation or Nondisclosure of Physical Defects in Property Sold,* 46 A.L.R.4th 546 (1986).

problems did not result in any loss or damage to Plaintiffs." Reviewing the facts in the light most favorable to the plaintiffs, we would not affirm the district court's judgment on this ground. While the district court may have correctly concluded, as a matter of law, that the loss of the plaintiffs' ranch was proximately caused by their own failure to make mortgage payments to Moore, these are not the only damages alleged by the plaintiffs. Genuine issues of material fact on the issue of damages preclude summary judgment for the defendant on that ground. However, while the district court's decision on these issues was incorrect, it is well established that a district court judgment may be affirmed on any proper legal grounds supported by the record. *Bird v. Rozier*, 948 P.2d 888, 892 (Wyo.1997).

[¶ 64] This court recently held in *Richardson v. Hardin*, to succeed on a claim of fraudulent misrepresentation, three elements must be established: First, the buyer must prove by clear and convincing evidence that the seller misrepresented a material fact; second, the buyer must establish that he relied upon the misrepresentations in entering into the contract and that such reliance was reasonable; and third, the buyer must demonstrate that he suffered injury as a result of his reliance upon the misrepresentation. *Richardson v. Hardin*, 5 P.3d 793, 797 (Wyo.2000) (citing *Schepps v. Howe*, 665 P.2d 504, 508 (Wyo.1983)). With regard to the reasonable reliance element, we recognized that the false representation must occur prior to the execution of the contract because, subsequent to the execution, the parties have the ability and obligation, pursuant to negotiated contract terms and the law, to allocate responsibility to inspect and investigate the property and its condition. *Id.* Here, as in *Richardson*, our review of the record discloses that the representations or concealment at issue occurred after the buy/sell contract was executed and the alleged defects could have been discovered through diligent enforcement of the buyer's contract right, or rights available by law, to inspect and investigate. We addressed a similar situation in *Schepps*, where we held that any misrepresentations made after the buy/sell contract was executed could not be the basis of actionable fraud because, as a matter of law, such misrepresentation could not serve as an inducement to the buyers to enter into the contract. Therefore, on the basis of this alternate ground, we will uphold the district court's grant of summary judgment to the defendant BHJ, Inc. on the plaintiffs' claims of fraud.

## CONCLUSION

[¶ 65] We reverse the district court's holding in appeal number 99–265 and hold that official action by a board of county commissioners which established a private road pursuant to Wyo. Stat. § 24–9–101 *et seq.* is necessary to vacate that same private road. In appeal number 99–256, we affirm the district court's grant of summary judgment as to defendants First American on plaintiffs' claims of breach of contract, negligence, negligent misrepresentation, bad faith, and fraud. We also affirm the district court's grant of summary judgment to the defendant BHJ, Inc. on the plaintiffs' claims of fraud. However, we vacate and remand the district court's grant of summary judgment on the ground of negligent misrepresentation for further proceedings consistent with this opinion.